Larry NORENE, Don Karabelnikoff and Grayce Oakley, as Citizens and taxpayers in the Municipality of Anchorage, Appellants,

v.

MUNICIPALITY OF ANCHORAGE and Humana of Alaska, Inc., d/b/a Humana Hospital, Appellees.

No. S–276.

Supreme Court of Alaska.

Aug. 9, 1985.

Michael W. Price, Michael P. Condon, Groh, Eggers & Price, Anchorage, for appellants.

David G. Berry, Asst. Municipal Atty., Anchorage, for appellee Municipality of Anchorage.

J.D. Cellars, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for appellee Humana of Alaska, Inc.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Three Anchorage taxpayers, Larry Norene, Don Karabelnikoff, and Grayce Oakley (Norene) attack a land exchange between the appellees Municipality of Anchorage (Anchorage) and Humana Hospital (Humana). Humana had been leasing its hospital site from Anchorage. In the transaction, Humana received the site (the Humana Hospital site), and adjoining land forming part of the municipal landfill (the landfill property), as well as $450,000. In exchange, Anchorage acquired interests in three downtown properties. First, it received title to the site of the old Community Hospital (the 825 'L' Street property), which it had been leasing from Humana and using as headquarters for its health department. Second, it received the right to lease the land immediately north of the Community Hospital (the lease-purchase property) for $100,000. The lease was to begin on January 1, 1983, and to run for a year. Humana gave Anchorage the option to purchase the property for $870,000, with the lease payment applied to the purchase price. Finally, Anchorage accepted an option to purchase three other downtown lots (the option-to-purchase property) for $906,-395. The option was to be exercised before the end of 1983. The Anchorage Assembly approved this arrangement on December 7, 1982.

Norene filed suit three months after the Assembly approved these exchanges, eventually raising four distinct arguments against the transaction. First, Norene contended that the landfill property which Anchorage gave up in the exchange had been dedicated as a park so that it could not be conveyed without voter approval. Second, Norene contended that the Anchorage Municipal Code (AMC) required Anchorage to appraise the tract adjacent to the landfill before disposing of it, and that Anchorage violated its own code when it did not em-

ploy an expert appraiser to do this. Third, Norene contended that the exchange, taken as a whole, constituted an abuse of discretion on the part of those who govern Anchorage. Finally, Norene contended that the Assembly had entered into "[a] lease purchase agreement with respect to acquisition of a capital improvement valued in excess of $1,000,000," and that under the Anchorage Home Rule Charter this transaction was invalid unless approved by the voters. The superior court rejected these arguments and granted summary judgment to Anchorage. We affirm.

In 1981, Alaska Hospital, Humana's predecessor in interest, suggested that Anchorage exchange part of the landfill and its interest in the Humana Hospital site for the land and building at 825 'L' Street. Anchorage hired an appraiser, who valued the interests Anchorage would acquire at $3,000,000, and the interests it would give up at $2,225,000. The appraiser for Alaska Hospital valued the 825 'L' Street property at between $3,400,000 and $4,000,000. The parties struck a tentative bargain. In return for the 825 'L' Street property, Anchorage would give Alaska Hospital the landfill property, the Humana Hospital site, and $775,000. The matter was presented to the Assembly. At this point, the Mayor of Anchorage made his reservations known. Shortly afterwards, the Alaska Hospital sold Humana all of its assets, including the 825 'L' Street property and its leasehold interest in the landfill property, and a new round of negotiations began. Eventually, the municipal staff and representatives of Humana negotiated the agreement that Norene is now attacking. The Assembly approved this agreement in December 1982.

The land swap proved controversial. Interested citizens contended that the appraisals on which the Assembly had relied were outdated, and that the property Anchorage was acquiring had been overvalued, while the property it was giving up had been undervalued. An ordinance rescinding the transaction was introduced. By a vote of 7–3, the Anchorage Assembly refused to rescind the transaction. Two months later, Norene filed suit in superior court.

I. *Does AMC § 25.30.080 require Anchorage to obtain a formal appraisal from a qualified appraiser before disposing of land?*

AMC § 25.30.080 reads, in pertinent part, as follows:

*Appraisal-Notice of Disposal*

A. Prior to the disposal of an interest in municipal land under Section 25.30.040A, the Division of Property Management shall determine the fair market value of the land.

■ Raymond Mann, property management officer for the Municipality of Anchorage, estimated the fair market value of Parcel 'F', one of the pieces of landfill property. Neither Mann nor anyone on his staff was a qualified appraiser.

Norene contends that the title of AMC § 25.30.080 "clearly indicates two requirements: first appraisal, and second, notice of disposal." Norene asserts that the term appraisal should be given its most common meaning: "an appraisal performed by a qualified appraiser for the purposes of determining fair market value."

According to Norene, the City did not meet the appraisal requirement of AMC § 25.30.080 because Mann is not a qualified appraiser, and therefore the sale of Parcel 'F' is void. Norene further contends that because Parcel 'F' was an integral part of the whole transaction, the entire transaction is void.

Anchorage suggests an alternative definition of the term "appraisal" as "a valuation of property by the estimate of an authorized person." Anchorage maintains that AMC § 25.30.080 does not require the Division of Property Management (DPM) to use any specific method to estimate fair market value, or to use appraisers with particular skills. In support of this position, Anchorage argues that had the Assembly wished to require an appraisal by a qualified appraiser, it would have done so.

Previous disposal ordinances had expressly required such appraisals. *See* Greater Anchorage Area Borough Code of Ordinances § 14.20.030(A); and City of Anchorage Code of Ordinances § 4.16.230. AMC § 25.-30.080 has no such requirement.

We are in agreement with Anchorage's interpretation of AMC § 25.30.080 and therefore hold that the superior court properly granted summary judgment in favor of Anchorage on this issue. In our view, the record in this case reflects that Anchorage's property management officer determined the fair market value of the subject 2.5 acre parcel in accordance with accepted appraisal methodology, thereby fulfilling the requirements of AMC § 25.30.080.

## II. *Was the land exchange an abuse of discretion?*

The parties agree that Anchorage had discretion to enter into land exchanges, and that a reviewing court has the authority to decide whether or not Anchorage abused this discretion. Norene argues that since there were a variety of factual errors in the information supplied to the Assembly by the municipal administration regarding the land-swap, the Assembly's decision to consummate the land swap constitutes an abuse of discretion.[1]

■ Anchorage responds that, given the information presented by the municipal administration, the Assembly did not act arbitrarily. While Norene may take issue with the wisdom of the Assembly's judgment, Anchorage argues in light of the facts as presented to the Assembly, no abuse of discretion took place. Implicit in Anchorage's argument is the further contention that it is the Assembly's exercise of discretion which this court should review and not that of the municipal administration. We agree with Anchorage's position.

According to McQuillin, "where a local legislative body has power to determine the expediency or necessity of measures relating to local government, its judgment upon the matters within the scope of its authority cannot be controlled by the courts."[2] As we stated in *Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974):

> It is not a court's role to decide whether a particular statute or ordinance is a wise one; the choice between competing notions of public policy is to be made by elected representatives of the people.

■ With these considerations in mind, we hold that the superior court appropriately granted summary judgment on this issue. Appraisers informed the Assembly that the land exchange was financially sound, and the Assembly was made aware of the problems with the properties it was acquiring. Varying estimates of the value of the land it was giving up were before it. The Assembly decided to rely on one estimate and disregard others. Consideration of such factors is for the Assembly, not the courts.

## III. *Does § 13.08 of the Anchorage Home Rule Charter require voter approval because the transaction Anchorage entered into was a lease-purchase agreement worth more that $1,000,-000?*

■ At issue here is one component of the subject land exchanges and § 13.08(b) of the Anchorage Home Rule Charter. Section 13.08(b) provides:

> The Assembly by ordinance may authorize a contract, lease, or obligation re-

---

1. Norene identifies four categories of mistakes. First, Norene contends that the appraisals on which the Assembly relied were flawed because the appraisals were out of date and were inadequate with respect to one of the landfill tracts Anchorage was to relinquish. (Norene identifies a $209,000 error in the valuing one of the tracts.) Second, Norene contends that the municipal administration failed to inform the Assembly that a municipal employee believed that the 825 'L' Street building would require extensive repairs. Third, Norene contends that Anchorage lacked a clear land disposal policy. Lastly, Norene contends that Anchorage's interest in the Humana Hospital site was worth far more than the Assembly realized.

2. 2 E. McQuillin, The Law of Municipal Corporations § 10.33, at 825 (3d ed. 1979).

quiring funds from future appropriations. A lease purchase agreement with respect to acquisition of a capital improvement valued in excess of $1,000,000 is not valid until approved by a majority of the qualified voters voting on the question.

We must first answer the question whether the transaction concerning Lots 7A, 8A, and 9A, Block 84, was a lease-purchase agreement as defined by AMC § 25.20.-060.[3]

We conclude that this transaction was a lease-purchase agreement as defined by AMC § 25.20.060. Anchorage agreed to lease for one year Lots 7A, 8A, and 9A, Block 84, for $100,000. After one year, Anchorage had the option to purchase the property for $870,000. The purchase price was to be reduced by the $100,000 Anchorage had paid in rent. Thus, the lease agreement would fall under any one of AMC § 25.20.060's subsections.

In reaching our conclusion, we reject Anchorage's argument that the transaction should not be considered a lease-purchase agreement. According to Anchorage, § 13.08(b) of the Anchorage Home Rule Charter is designed to preclude the use of lease-purchase agreements to avoid the constitutional debt limitation. Anchorage maintains that this transaction does not lock it into a long-term lease agreement which will compel it to purchase the property or lose the equity it has built up through rent payments. Therefore, Anchorage argues that considering this transaction a lease-purchase agreement will not further the policy behind § 13.08 of the Anchorage Home Rule Charter.

We are not persuaded by Anchorage's position. This transaction meets the definition of a lease-purchase agreement set out in AMC § 25.20.060. Further, the fact that the lease's term is for only one year is not of any legal significance. Anchorage will lose the $100,000 in equity if it does not purchase the land. Therefore, we conclude that the transaction concerning Lots 7A, 8A, and 9A, Block 84, is a lease-purchase agreement.

Second, we must decide if the agreement is a capital expenditure valued in excess of $1,000,000, and therefore violative of § 13.-08 of the Charter. Anchorage contends that the purchase price of the leased properties is less than $1,000,000.

■■■ The Charter refers to "a capital improvement." In the land swap Anchorage acquired three different properties. According to the Charter, it is the capital improvement, not the lease-purchase agreement, which must be valued in excess of $1,000,000.[4] The capital improvement at issue here, the property Anchorage would acquire under the lease-purchase agreement, was worth $870,000, the price Anchorage was willing to pay for it. Because this amount is less than $1,000,000, we conclude that the transaction did not violate the Charter.[5]

IV. *Was the landfill dedicated as a park so that Anchorage could not transfer it without first obtaining voter approval pursuant to § 10.02(8) of the Anchorage Home Rule Charter?*

In July of 1973, the Department of Environmental Conservation (DEC), State of

---

**3.** AMC § 25.20.060 reads as follows:
*Lease-purchase agreements.*
The municipality may acquire real property by a lease-purchase agreement under Chapter § 13.08(b), which shall mean an agreement:
A. Under which the municipality pays rent for the use of the real property;
B. which grants the municipality an option to purchase the real property; and
C. which allows the municipality to apply all or part of the rent payments to the purchase price of the real property.

**4.** The Charter's crucial sentence has two antecedents ("[a] lease purchase agreement" and "a

capital improvement") and two consequents ("valued in excess of $1,000,000" and "is not valid") and it is certainly possible to read "valued in excess of $1,000,000" as referring to "lease purchase agreement." We reject this reading, principally because "valued" is a term one usually applies to property, not to agreements.

**5.** Anchorage acquired three different properties in the land exchange. If it had planned to use all three properties in a single project, then they might have constituted a single capital improvement. As it is, they do not.

Alaska, enacted solid waste management regulations. These provided, in part, that no person could operate a large solid waste disposal facility without a state permit, and that no one could obtain a permit without submitting

a report detailing the proposed method of operation, population and area to be served, the characteristics, quantity and source of material to be processed, the use and distribution of processed materials, method of residue disposal, emergency operating procedures, the type and amount of equipment to be provided, and the proposed ultimate land use plan.

18 Alaska Administrative Code (AAC) § 60.020(b)(4) (1973) (repealed October 9, 1983). In response, the City of Anchorage proposed a Municipal Sanitary Landfill Master Plan. The Master Plan provided that 110.8 acres of the landfill would eventually be used as a park, with a "variety of facilities and uses," including a center for retired persons, a ski hill, and a stadium. This Master Plan was presented to the City Council in December 1973, and finally approved on August 27, 1974. The Council's minutes describe what it approved as a "Landfill Plan—Final Land Use and Gravel Extraction." The memorandum the administration submitted to the council specifically noted that part of the landfill "was designated as Park," but also recited that "[a]ll park uses shown on [the] attached map are illustrative and in all probability will be altered before time of implementation." The administration estimated that the site would continue to be a landfill for fifteen years.[6]

By 1978, Anchorage had changed its mind about the property. In that year, it adopted the Merrill Field Master Plan, providing that the landfill property would eventually be used for airport expansion, and that an area south of the property, across 15th Avenue, would be designated as a park. Various letters and memoranda circulated between 1978 and 1982 indicate that the landfill property was to have become a park. In fact, one letter refers to the removal of a "Park land dedication restriction" on the property.

If Anchorage had indeed dedicated the property for park purposes, it could not have transferred the property without approval from the voters. Section 10.02(8) of the Anchorage Charter provides in part:

An ordinance conveying an interest in real property dedicated to public park or recreational purposes is valid only upon approval by a majority of those voting on the question at a regular or special election. The Assembly shall publish notice of the election, including a description of the property by proper place name and legal description and the terms and conditions of the conveyance.

Norene's argues that when the Anchorage City Council approved the landfill plan in 1974, it expressly dedicated the landfill property for park purposes. Anchorage responds that approval of a plan is not a formal designation of land use under § 10.02(8) of the Anchorage Charter.

The commentary to the Anchorage Charter § 10.02(8) defines "dedication" as a "formal designation."[7]

This paragraph provides that conveyance of an interest in real property 'dedicated' to public park or recreational purposes requires a majority vote of the people. The term 'dedicated' is intended to indicate formal designation of the land in question for permanent or long-term park or recreational purposes. Land intended for ultimate use for some other purpose may be used in the interim for park or recreational purposes without triggering the election requirement of this paragraph.

---

**6.** Prior to August 1974, the City included references to park construction in its long range capital improvement program. Even after unification, plans for park construction were still being made, although construction was pushed further and further into the future.

**7.** The Charter Commission's commentary is intended as "[a]n aid to legislative history, to assist in the interpretation of the Charter document."

On the basis of the foregoing, we conclude that for the purposes of § 10.02(8) of the Charter, Anchorage formally and explicitly dedicated the property in question as public park and recreation land when it adopted the Municipal Sanitary Landfill Master Plan on August 27, 1974. However, the 1979 Merrill Field Master Plan essentially superseded the 1974 Municipal Sanitary Landfill Master Plan. The Merrill Field Master Plan constituted a formal and express subsequent dedication of the land in question for purposes other than park and recreational purposes. McQuillin states the following:

> Where ... the dedication is made by the state, the intention of the state controls the use, and the state may change the original use for other public uses....

11 E. McQuillin, *The Law of Municipal Corporations* § 33.74, at 820–21 (3d ed. 1983).

On the record before us, this formal and express dedication made in 1979 of the land in question constituted an effective revocation of the 1974 dedication of the property for park and recreational purposes. There is no indication in the record that the 1979 administrative action taken by Anchorage was intended to facilitate disposal of the property in contravention of the majority approval-election requirements of § 10.-02(8) of the Anchorage Charter. We therefore hold that Anchorage had the authority to revoke the 1974 dedication to park and recreational land.

AFFIRMED.

MOORE, J., not participating.