**CARR–GOTTSTEIN PROPERTIES,**
Appellant,

v.

**STATE of Alaska and Alaska Department
of Natural Resources, Appellees.**

No. S–6846.

Supreme Court of Alaska.

July 14, 1995.

James N. Reeves, Michael T. Stehle, Bogle & Gates, Anchorage, for appellant.

Eric E. Wohlforth, Thomas F. Klinkner, Wohlforth, Argetsinger, Johnson & Brecht, Anchorage, for appellees.

## OPINION

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

PER CURIAM.

We have determined that none of the points raised by appellant are meritorious. We agree with the decisions entered in this case by the Honorable Larry R. Weeks, superior court judge.[1] The judgment is AFFIRMED.

APPENDIX A

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA FIRST JUDICIAL DISTRICT AT JUNEAU

Case No. 3AN–94–4995 CI

ORDER AFFIRMING DECISION OF ALASKA DEPARTMENT OF NATURAL RESOURCES

*MEMORANDUM AND ORDER*

*Introduction*

This case comes before the court on Appellant Carr–Gottstein's (CG's) appeal of the Commissioner of the Alaska Department of Natural Resources' (DNR's) decision entitled "Final Finding Approving Lease/Purchase Agreement for Anchorage Times Facility Between DNR and ACS," dated April 11, 1994. The superior court has jurisdiction to hear this appeal pursuant to AS 22.10.020(d).[1] Oral argument was heard on CG's Appeal on November 28, 1994 in Juneau Superior Court. At the conclusion of oral argument,

1. The decisions are appended, having been edited in conformity with Supreme Court procedural standards.

1. AS 22.10.020(d) provides:
 The superior court has jurisdiction in all matters appealed to it from a subordinate court, or administrative agency when appeal is provided by law. The hearings on appeal from a final order or judgment of a subordinate court or administrative agency shall be on the record unless the superior court, in its discretion, grants a trial de novo, in whole or in part.

the court AFFIRMED the final decision of DNR.

*Background*
## THE LEASE–PURCHASE AGREEMENT

During 1993, the Alaska Court System (ACS) determined it did not have enough office and warehouse space in Anchorage. At that time, ACS was leasing property from Carr–Gottstein Properties. Upon expiration of that lease, ACS determined its property needs could be met by leasing what is known as "The Anchorage Times Building" (Property) owned by VECO. ACS commissioned two appraisals of the Property, and the Property was valued at between $3.3 to $3.75 million. The owner of the Property and ACS negotiated a purchase price of $3.15 million.

To acquire the Property, ACS used what is known as a "lease-purchase" agreement. Under the terms of the agreement, the bi-annual lease payments on the Property for the agreed ten-year lease are essentially equal to one-tenth of the negotiated purchase price. The bi-annual lease payments also include the costs of improvements and renovations needed to meet the interior space requirements of ACS. If the Legislature appropriates funding for each yearly lease payment, the State may acquire the building at the end of the lease for a nominal purchase price.

The mechanics of the ACS/DNR lease-purchase agreement involve multiple parties: (1) ACS, the lessee, (2) DNR, the lessor, (3) VECO, the owner of the property, (4) the bank, acting as Trustee, and (5) the purchasers of certificates of participation (COPs) sold by the Trustee. The agreement specifies that DNR, the lessor, holds title to the Property, and ACS, the lessee, makes bi-annual lease payments to DNR. The yearly lease payments are divided between principal and interest, and the interest is excluded from the seller's gross income for federal income tax purposes.

Under the agreement, DNR assigned its rights under the lease "without recourse," to Seattle First National Bank, acting as Trustee. As Trustee, Seattle First National Bank sold certificates of participation (COPs) to VECO. At this juncture, VECO holds the COPs, and will eventually sell them to COP purchasers. The COPs are negotiable. Each COP holder is entitled to a percentage share of the payments made by ACS over the term of the lease. When the COPs are sold to investor-purchasers, the proceeds will go to the previous owner, VECO. DNR granted a deed of trust on the Property to be held by a trustee as security for the COP purchasers in the event that the legislature does not appropriate funds for future bi-annual lease payments.

Finally, rather than make improvements prior to the lease of the Property to ACS, VECO and ACS agreed that VECO would deposit $2.85 million in an account held in trust solely for the purpose of renovating the Property. The $2.85 million may be spent at the direction of ACS to renovate and modify the building to its particular needs.

## PROCEDURAL HISTORY

On October 26, 1993, pursuant to AS 36.30.080(c), ACS notified the Legislature of its intention to enter into a lease purchase agreement regarding the Property. At that time, ACS did not need legislative approval to enter into the lease-purchase agreement. In November of 1993, DNR determined that the lease-purchase agreement was in the best interests of the State. After an initial procedural error in providing a sufficient period for notice and comment as required by AS 38.05.945(b), DNR set a second notice and comment period from February 2, 1994 until March 7, 1994. On April 11, DNR issued a final finding approving the lease-purchase agreement.

CG filed a Motion for Reconsideration of DNR's final decision. DNR denied CG's Motion for Reconsideration. CG filed an appeal of DNR's final decision in Anchorage Superior Court. The appeal was reassigned to Judge Larry Weeks, Superior Court Judge of the First Judicial District at Juneau on November 1, 1994.

## LEGISLATIVE BACKGROUND

In 1993, the Legislature enacted 1993 SLA Chapter 37 (SB 129) which amended AS 36.30.080(c) to require notice to the Legislature before the legislative or judicial branch entered into a lease-purchase agreement. In compliance with amended AS 36.30.080(c), ACS notified the Legislature of its intention to enter into a lease-purchase agreement involving ACS and DNR.

After the Legislature was notified of ACS' intention, the Alaska Legislative Budget and Audit Committee scheduled hearings regarding the ACS lease-purchase agreement. After hearings in December of 1993 and early January of 1994, the Legislative Budget and Audit Committee voted unanimously on January 12, 1994 to introduce SB 247.

SB 247 proposed an amendment to AS 36.30.080(c) which would require not only notification of ACS' intention to enter into a lease-purchase agreement, but also legislative approval. In addition, SB 247 proposed an amendment to AS 38.05.030 to specifically prohibit DNR from acquiring real property through the use of lease-purchase agreements. During the course of debate in the Legislative Budget and Audit Committee on December 29, 1994 and in the House Finance Committee on April 20, 1994, members of both committees heard testimony from Arthur Snowden, the Administrative Director of the Alaska Court System, state bond counsel, assistant attorneys general, and other parties with intimate knowledge of the Anchorage Times Property lease-purchase agreement.

At the end of the process, SB 247 as amended was enacted into law as 1994 SLA Ch. 75. The Legislature, after debating the problems associated with lease-purchase agreements, restricted their use in the future. However, the Legislature *specifically* provided in 1994 SLA Ch. 75 § 12, that ACS and DNR could complete the lease-purchase agreement involving the Anchorage Times Property. The Legislature allowed ACS and DNR until December 31, 1994 to complete the Anchorage Times Property lease-purchase agreement.[2]

## QUESTIONS PRESENTED

CG's appeal of DNR's final decision presents three questions on review:

1. Whether the lease purchase agreement between DNR and ACS violates the debt restriction provision of article IX, section 8 of the Alaska Constitution.

2. Whether DNR exceeded its statutory authority pursuant to AS 36.30 in acquiring the Anchorage Times Property.

3. Whether the procedure of placing funds in escrow for the renovation of the Anchorage Times Property violates article IX, section 13 of the Alaska Constitution where the funds are not subject to the legislative appropriation procedure.

*Discussion*

## STANDARD OF REVIEW

 Where an administrative agency decision involves the expertise of the agency or where the agency has made a fundamental

---

2. 1994 SLA Ch. 75 § 12 provides:

12. APPLICABILITY TO ALASKA COURT SYSTEM AND DEPARTMENT OF NATURAL RESOURCES.

(a) Notwithstanding the amendments of AS 22.05.025(a) made by sec. 2 of this Act, AS 36.30.030 made by sec. 5 of this Act, and AS 36.30.080(c) made by sec. 6 of this Act, the addition of AS 36.30.085 made by sec. 7 of this Act, and the repeal of AS 36.30.080(b) made by sec. 11 of this Act, after the effective date of this section and until December 31, 1994, the Alaska Supreme Court may continue to enter into lease-purchase or lease-financing agreements for the judicial branch under the provisions of AS 22.05.025(a), AS 36.30.030, 36.30.080(b), and 36.30.080(c) as they read before their amendment or repeal by this Act.

(b) Notwithstanding the amendments of AS 36.30.080(c) made by sec. 6 of this Act, AS 36.30.850(b)(5) made by sec. 8 of this Act, and AS 36.30.850(c) made by sec. 9 of this Act, the addition of AS 36.30.085 made by sec. 7 of this Act and of AS 38.05.030(g) made by sec. 10 of this Act, and the repeal of AS 36.30.080(b) made by sec. 11 of this Act, after the effective date of this section and until December 31, 1994, the Department of Natural Resources may continue to enter into lease-purchase or lease-financing agreements under the provisions of AS 36.30.080(b), 36.30.080(c), 36.30.850(b)(5), 36.30.850(c), and AS 38.05 as they read before their amendment or repeal by this Act, but only if the Department of Natural Resources is the lessor of the property and the judicial branch is lessee.

policy decision, reviewing courts defer to the agency decision if it is supported by a reasonable basis. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987); *State, Dep't of Rev. v. Debenham Elec. Supply Co.*, 612 P.2d 1001, 1003 n. 6 (Alaska 1980); *Mobil Oil Corp. v. Local Boundary Comm'n*, 518 P.2d 92, 98 (Alaska 1974). However, where an agency interprets a statute which does not implicate the agency's special expertise or determination of fundamental policies, a reviewing court in Alaska exercises its independent judgment. *City of Valdez v. State, Dep't of Community & Regional Affairs*, 793 P.2d 532, 533 n. 6 (Alaska 1990). Similarly, where constitutional issues present questions of law, a reviewing court applies its independent judgment. Constitutional issues "should be given a reasonable and practical interpretation in accordance with common sense." *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992).

CG's appeal raises questions of statutory interpretation and constitutional issues which neither involve fundamental policy formulation by DNR nor the agency's expertise. CG raised questions before DNR at the agency level regarding whether the lease-purchase of the Anchorage Times Property is in the best interests of the State of Alaska. CG does not assert those claims in this appeal. Therefore, there are no issues before this court which require deference to agency expertise. The court will apply its independent judgment in reviewing the questions of statutory interpretation and constitutional issues raised in CG's appeal. *Arco Alaska Inc. v. State*, 824 P.2d at 710; *City of Valdez v. State, Dep't of Community and Regional Affairs*, 793 P.2d at 533.

## CONSTITUTIONAL DEBT RESTRICTION

1. Whether the lease purchase agreement between DNR and ACS violates the debt restriction provision of article IX, section 8 of the Alaska Constitution.

Article IX, section 8 of the Alaska Constitution provides:

> No state debt shall be contracted unless authorized by law for capital improvements or unless authorized by law for housing loans for veterans, and ratified by a majority of the qualified voters of the State who vote on the question. The State may, as provided by law without ratification, contract debt for the purpose of repelling invasion, suppressing insurrection, defending the State in war, meeting natural disasters, or redeeming indebtedness outstanding at the time this constitution becomes effective.

CG argues that the lease-purchase agreement between ACS and DNR creates state debt without proper authorization under article IX, section 8. CG maintains that the COPs, the deed of trust and the terms of the lease-purchase agreement itself obligate the State to pay the full amount of the principal due under the certificates. Thus, CG asserts that the State has taken on a debt to pay $6.153 million plus interest over a ten-year period rather than pay rent for one year's term. CG argues that the State has taken on an "unconditional payment obligation" under the deed of trust," and the fact that the lease provides that bi-annual rental payments are subject to legislative non-appropriation is "immaterial." Further, CG argues that once the lease is in effect, the "free exercise" of future Legislatures will be discouraged when faced with the prospect of non-appropriation and the resulting loss of ACS's facilities.

CG argues that the ACS/DNR lease-purchase agreement is nothing more than "a conditional sales contract in substance," and should be viewed as an unauthorized state debt. CG rejects precedent in other jurisdictions which hold that where a lease-purchase agreement is subject to annual appropriation, constitutional debt restrictions are not offended. CG argues that the court should give a broad interpretation to the meaning of "debt" when interpreting the constitutional debt restriction of article IX, section 8 of the Alaska Constitution.

The State responds, arguing where bi-annual lease payments under the ACS/DNR lease are subject to annual appropriation by the legislature, that the State does not incur the kind of long term "debt" prohibited by article IX, section 8. The State argues that

the legislature is free to "non-appropriate" funds for the lease during any legislative session. The State points to a survey of other jurisdictions which hold that inclusion of a non-appropriation clause in a lease-purchase agreement does not create the type of "debt" which is offensive to constitutional debt limitation provisions. The State asserts that legislative non-appropriation does not constitute "default" under the lease. If non-appropriation were to occur, the State argues it would not "forfeit" its equity; instead, it would be entitled under the lease to receive the surplus proceeds of the sale or reletting of the property after paying the outstanding principal owed under the lease.

## ALASKA PRECEDENT

In a series of cases, the Alaska Supreme Court has interpreted the meaning of "debt" in relation to the Alaska Constitution. In *DeArmond v. Alaska State Development Corp.*, 376 P.2d 717 (Alaska 1962), the newly created Alaska State Development Corporation (ASDC) sought to sell bonds in order to raise money to provide investment capital for Alaska businesses. The Alaska Supreme Court held that where the sale of bonds is backed only by the credit of ASDC, the debt incurred is not the State's. *DeArmond*, 376 P.2d at 722. The court noted that the legislation creating ASDC specifically provided that bonds sold by ASDC did not constitute a pledge of the State's credit. *Id.*

In *Walker v. Alaska State Mortgage Ass'n*, 416 P.2d 245 (Alaska 1966), the appellant argued that funds raised through the sale of bonds by the Alaska State Mortgage Association created state debt in violation of article XI, section 8 of the Alaska Constitution. *Walker*, 416 P.2d at 253. The *Walker* court reaffirmed its position in *DeArmond*, holding that where the sale of bonds clearly specifies that bonds are backed only by the resources of the corporation, they do not create state debt. *Id.* As the State points out, in *Walker*, the Alaska Supreme Court cited *Book v. State Office Bldg. Comm'n*, [238 Ind. 120] 149 N.E.2d 273 (1958), in support of its holding. *Walker*, 416 P.2d at 253, n. 39.

In *Book*, the Indiana Supreme Court reviewed the terms of a lease between the State Office Building Commission and state agencies which leased space in the building. *Book*, 149 N.E.2d at 286–87. The *Book* court held:

> In our opinion this language [in the lease agreement] neither requires the State departments and agencies to rent any space in the proposed building nor binds *any future session of the Legislature to appropriate the funds with which to pay the rental due* by reason of any use and occupancy agreement which may be consummated by any of the State departments and agencies and the commission. (Emphasis added.)

*Id.* The *Book* court based its holding that the lease in question did not create debt in contravention of the Indiana Constitution, in part, on the inclusion of a non-appropriation clause in the lease agreement. In addition, in its brief, the State notes that the *Book* court cited *State ex rel. Thomson v. Giessel*, [271 Wis. 15] 72 N.W.2d 577 (1955), in which the Wisconsin Supreme Court held that the inclusion of non-appropriation clauses in lease-purchase agreements prevents a state debt obligation from arising. *Giessel*, 72 N.W.2d at 590 ("[N]o state debt is created where payments are to be made solely at the state's option"). The *Giessel* decision has been cited as a leading authority for courts which uphold lease-purchase agreements based, in part, on the inclusion of a non-appropriation clause. Reuven M. Bisk, *State and Municipal Lease–Purchase Agreements: A Reassessment*, 7 Harv.J.L. & Pub.Pol'y 522, 536–37, 545–46 (1984).

In *Norene v. Municipality of Anchorage*, 704 P.2d 199 (Alaska 1985), the court considered whether an Anchorage Home Rule Charter provision which provided that any "lease-purchase" agreement which was in excess of $1 million required voter approval. The *Norene* court held that the Municipality had entered into a "lease-purchase" agreement, but upheld the Municipality's actions because the lease-purchase agreement did not involve a purchase of more than $1 million.

The *Norene* court's decision to uphold a lease-purchase agreement supports the prop-

osition that lease-purchase agreements are not offensive *per se* to the constitutional debt limitation in article IX, section 8. The *Norene* court upheld the lease purchase agreement on grounds that the amounts of the lease provisions did not individually exceed $1 million. *Id.* Further, the *Norene* court upheld the agreement even though the terms of the agreement provided that the municipality would lose its equity in leased land if it decided not to purchase the property at the end of the lease. *Id.* In order to uphold the lease-purchase agreement, the *Norene* court necessarily had to approve of lease-purchase agreements as a threshold matter.

Finally, in *Village of Chefornak v. Hooper Bay Constr.*, 758 P.2d 1266 (Alaska 1988), the court defined "debt" in the context of article IX of the Alaska Constitution. In *Chefornak*, the issue was whether a breach of contract claim settled by the municipality created a debt under article IX, section 9 of the Alaska Constitution.[3] The *Chefornak* court rejected an interpretation of debt in relation to article IX based on the "commonly under-

stood" meaning of debt as "every obligation to pay money." *Chefornak*, 758 P.2d at 1269 (quoting *Rochlin v. State*, [112 Ariz. 171, 175] 540 P.2d 643, 647 (1975)). The *Chefornak* court adopted a "less comprehensive" definition of debt where it is used "in the constitutional sense":

This court has many times said what Article 8 means by the word "debt." We think that it means borrowed money; it denotes an obligation created by the loan of money, usually evidenced by bonds but possibly created by the issuance of paper bearing a different label.

*Chefornak*, 758 P.2d at 1270 (quoting *State ex rel. Wittler v. Yelle*, [65 Wash.2d 660] 399 P.2d 319, 324 (1965)).

■ When taken together, this court finds that the foregoing Alaska cases and the cases cited by the Alaska Supreme Court define constitutional "debt" as a term of art used to describe an "obligation" involving borrowed money where "there is a promise to pay sums such as rents accruing in the future whether funds are available or not." Bisk, *supra*, at 522, 537.[4] Where a lease-purchase

3. Article IX, section 8 originally provided debt restrictions for both state and political subdivisions or municipalities. Debt restrictions covering the state and its political subdivisions were eventually divided into two sections: section 8 provides debt restrictions for the state; and section 9 for political subdivisions. *Village of Chefornak v. Hooper Bay Constr.*, 758 P.2d 1266, 1269 n. 5 (Alaska 1988).

4. The Delegates to the Alaska Constitution did not specifically prohibit the use of lease-purchase agreements. The court finds that lease-purchase agreements which are subject to yearly appropriation and which the Legislature may cancel are not "debt" within the restrictions explicitly stated in article IX, section 8, or contemplated by the Delegates. The following excerpt from the Constitutional Convention appears to be the only comment by the Delegates on article IX, section 8. The court finds that the lease-agreement in the case at bar does not fall within the constitutional debt restriction as contemplated by the Framers.

SIXTY–SEVENTH DAY

HELLENTHAL: I have a question I want to ask of Mr. Nordale for purposes of the record and to assist Style and Drafting in a possible clarification. Mr. Nerland, I mean. In Section 11, where the Committee deals with the nonapplicability of the restrictions on debt, in the case of revenue bonds issued by public

corporations of the state, first; public enterprises of the state, second; and thirdly, any political subdivision. Does the Committee mean by that language that any political subdivision can issue revenue bonds either through a public corporation or through a public enterprise, or directly, like the City of Anchorage did with its Eklutna project; and in the event that they choose to issue them directly without employing the device of the public corporation, will those bonds be exempt from the restrictions applicable to debt?

NERLAND: That was the intention of the Committee, Mr. Hellenthal.

February 3, 1956
SEVENTY–THIRD DAY

BARR: I would like to ask the grammarian in the Style and Drafting Committee about Section 11. It seems to me that there is one comma in the first sentence which doesn't seem to be placed right. If so, there should be a couple ahead of it, "The restrictions on contracting debt do not apply to debt incurred through the issuance of revenue bonds by a public enterprise or public corporation of the state or a political subdivision, when the only security is the revenues of the enterprise or corporation."

PRESIDENT EGAN: Who is the grammarian, Mrs. Nordale?

SUNDBORG: Mrs. Nordale.

NORDALE: Well, actually, if you put commas in there you would change the meaning of it, at

agreement does not require a future legislature to appropriate funds,[5] the agreement is not a long-term binding obligation to repay borrowed money pursuant to article IX, section 8, and is not "debt" as defined by the Alaska Supreme Court.[6]

## LEASE–PURCHASE AGREEMENTS IN OTHER JURISDICTIONS

During oral argument, the State argued that the majority of jurisdictions which have considered constitutional debt limitations

least our understanding of it. They do not apply to debts incurred through the issuance of revenue bonds by a public enterprise or public corporation of the state or political subdivision. You see the whole thing is tied together. It could be either a public enterprise of the state or a political subdivision, or public corporation of the state or a political subdivision. BARR: Why is the comma before the word "when"? What does it separate? NORDALE: That just separates a clause that applies to the whole sentence. BARR: Yes, but there is no separation of thought there. NORDALE: Well, restrictions do not apply when the only security is the revenues of the enterprise or corporation. BARR: Then you wouldn't have a comma. I wouldn't. NORDALE: Well, wouldn't you like to stop to take a breath?

5. CG argues that the result of a lease-purchase agreement restricts legislative discretion. CG argues that for financial reasons, future legislatures might find it difficult, if not impossible, to stop appropriating funds for the ACS lease. CG argues that the case at bar is similar to *Sonneman v. Hickel*, 836 P.2d 936 (Alaska 1992). In *Sonneman*, the Alaska Supreme Court held that a statute which provided that the "the legislature may appropriate amounts from the ... fund ... to the ... marine highway system," did not legally restrict the legislature from using funds for other purposes after a portion of the statute was severed away. The court severed a portion of the statute in question which *specifically* prevented the Legislature from dedicating funds in question for any other use. *Id.* at 940–41.

There is no provision in the lease-purchase agreement in the case at bar which prevents the legislature from exercising the option of non-appropriation. While economic incentives may make the ACS lease-purchase of the Anchorage Times Property attractive, economic incentives alone do not restrict the Legislature's free exercise of discretion. See *Schulz v. State* [84 N.Y.2d 231, 616 N.Y.S.2d 343, 352], 639 N.E.2d 1140, 1149 (1994) (Such spending plans are effectual

have upheld lease-purchase agreements which contain a non-appropriation clause.[7] CG argued that the courts in jurisdictions cited by the State approved lease-purchase agreements based on the inclusion of a non-appropriation clause *and*, because the lease-purchase agreement was between a third party and an independent state corporation (e.g. transit authority). The State responded, arguing that the terminable nature of the obligation based on the inclusion of a non-appropriation clause, rather than the status of the parties, is the determinative factor

only to the extent subsequent legislatures indeed do "give effect to them by providing the means and directing their payment, but the discretion and responsibility is with them as if no former appropriations had been made. No duty or obligation is devolved upon them by the acts of their predecessors.").

6. The Alaska Attorney General approved the ACS/DNR lease-purchase agreements on June 2, 1994.

7. See *Opinion of the Justices*, 335 So.2d 376, 379–80 (Ala.1976); *Glennon Heights, Inc. v. Central Bank & Trust*, 658 P.2d 872, 878–79 (Colo. 1983); *State v. Brevard County*, 539 So.2d 461, 463–64 (Fla.1989); *Barkley v. City of Rome* [259 Ga. 355], 381 S.E.2d 34, 35 (1989); *Berger v. Howlett* [25 Ill.2d 128], 182 N.E.2d 673, 675 (1962); *State ex rel. Fatzer v. Armory Bd.* [174 Kan. 369], 256 P.2d 143, 151 (1953); *Warren County Fiscal Court v. Warren County Tuberculosis Sanitorium Corp.*, 272 S.W.2d 331, 332 (Ky. 1954); *Edgerly v. Honeywell Information Sys., Inc.*, 377 A.2d 104, 108 (Me.1977); *St. Charles City–County Library Dist. v. St. Charles Library Bldg. Corp.*, 627 S.W.2d 64, 66–68 (Mo.App. 1981); *Ruge v. State* [201 Neb. 391], 267 N.W.2d 748, 750–51 (1978); *Enourato v. New Jersey Bldg. Auth.* [90 N.J. 396], 448 A.2d 449, 455–56 (1982); *Schulz v. State* [84 N.Y.2d 231, 616 N.Y.S.2d 343], 639 N.E.2d 1140 (1994); *Halstead v. McHendry*, 566 P.2d 134, 137–38 (Okla.1977); *State ex rel. Kane v. Goldschmidt* [308 Or. 573], 783 P.2d 988, 995–96 (1989); *Caddell v. Lexington County Sch. Dist. No. 1* [296 S.C. 397], 373 S.E.2d 598, 599 (1988); *Millar v. Barnett* [88 S.D. 460], 221 N.W.2d 8, 9–10 (1974); *Texas Public Bldg. Auth. v. Mattox*, 686 S.W.2d 924, 927–29 (Tx.1985); *Municipal Bldg. Auth. of Iron County v. Lowder*, 711 P.2d 273, 278–80 (Utah 1985); *Dykes v. Northern Virginia Transp. Dist. Comm'n* [242 Va. 357], 411 S.E.2d 1, 9–10 (1991) (on rehearing); *Department of Ecology v. State Finance Committee* [116 Wash.2d 246], 804 P.2d 1241, 1244–47 (1991); *Dieck v. Unified Sch. Dist. of Antigo* [165 Wis.2d 458], 477 N.W.2d 613, 618–21 (1991).

when assessing constitutional debt restrictions in the context of lease-purchase agreements.

The court finds that the independent nature of the state corporation or authority is some evidence that the State is not contracting debt in a lease-purchase agreement. However, the nature or relationship of the contracting parties alone is not the dispositive issue in determining whether an agreement violates the debt restriction in article IX, section 8. The court finds that the reasoning in the cases cited by the State is in accordance with Alaska law. In *DeArmond, Walker,* and *Norene,* the Alaska Supreme Court examined the terms of the lease or transaction to determine whether a debt obligation had been created within the constitutional definition of "debt." *See accord Giessel,* 72 N.W.2d at 590. The lease-purchase agreement in the case at bar contains a non-appropriation clause and other terms which limit the recourse of the COP holders to the leased property.[8] The court finds that the lease-purchase agreement does not create debt based on the terms of the agreement, notwithstanding the status of the contracting parties.[9] The court upholds the lease agreement in the case at bar where the lease (1) contains a non-appropriation clause; (2) limits recourse to the leased property;

and (3) does not create a long-term obligation binding future generations or Legislatures.[10]

## STATUTORY AUTHORITY TO ENTER LEASE

2. Whether DNR exceeded its statutory authority in acquiring the Anchorage Times Property.

CG argues that DNR lacks the statutory authority to enter into the ACS/DNR lease. The State responds, arguing that the plain meaning of the statutory authority authorizing DNR to enter into leases is broad. Further, the State argues that the Legislature was notified of the ACS/DNR lease-purchase agreement, and while exercising its oversight authority regarding future lease-purchase agreements, the Legislature provided specific statutory authority for DNR to proceed with the ACS/DNR lease.

The applicable statutes authorizing ACS and DNR to enter into lease-purchase agreements provide:

AS 36.30.080. Leases.[11]

. . . .

(b) The department, legislative branch, or judicial branch may enter into lease-purchase agreements, including lease-financing agreements. A lease-purchase agreement must provide that lease payments are subject to annual appropriation.

---

**8.** ACS/DNR Lease § 3.01 (ACS can terminate the lease at its option pursuant to § 3.03).

ACS/DNR Lease § 3.03 states:
Lessee is obligated only to pay such Rental Payments under this Agreement as may be lawfully made from funds budgeted and appropriated for that purpose during Lessee's then current budget year. . . . Should Lessee fail to appropriate or otherwise make available funds to pay Rental Payments following the then current Original Term or Renewal Term, this Agreement shall be deemed terminated at the end of the then current Original Term or Renewal Term.
ACS/DNR Lease § 6.01 provides that the "Rental Payments" are not to be construed as the creation of indebtedness of the Lessee of a pledge of the general tax revenues, but are a current expense only.

**9.** CG argues that the court should follow the reasoning in *Montano v. Gabaldon* [108 N.M. 94], 766 P.2d 1328 (1989). In *Montano,* the

court held that where a lease-purchase agreement which is terminated during the course of a lease results in the municipality or state's loss of all equity, the lease agreement constitutes the unconstitutional creation of debt. *Id.* [766 P.2d] at 1330. The *Montano* court adopts the view that any "equitable, moral or contingent" duty to appropriate funds for each lease term is offensive to the constitutional prohibition against creating debt without voter approval. *Id.* [766 P.2d] at 1329–30. The *Montano* decision is distinguishable from the facts of the case at bar. The ACS/DNR lease provides that ACS does not lose all equity upon termination of the agreement pursuant to ACS/DNR Lease § 13.02 and 13.03 (surplus rental payments in excess of rent due and outstanding principal payments, are awarded to the lessee). The court declines to follow the reasoning of the *Montano* court based on the foregoing discussion.

**10.** *See generally* Bisk, *supra.*

**11.** AS 36.30.080 (prior to June 7, 1994).

(c) If the department, legislative branch, or judicial branch intends to enter into or renew a lease of real property with an annual rent to the department, legislative branch, or judicial branch that is anticipated to exceed $1,000,000, or with total lease payments that exceed $10,000,000 for the full term of the lease, the department, legislative branch, or judicial branch shall provide notice to the legislature.

AS 38.05.035. Powers and Duties of the Director. (a) The director shall

. . . .

(2) manage, inspect and control state land and improvements on it belonging to the state and under the jurisdiction of the division;

. . . .

(12) be the certifying agent of the state to select, accept, and secure by deed whatever action is necessary in the name of the state, by deed, sale, gift, devise, judgment, operation of law, or other means any land, of whatever nature or interest available to the state.

1994 SLA Ch. 75 § 12(b):

(b) [T]he Department of Natural Resources may continue to enter into lease-purchase or lease-financing agreements ... but only if the Department of Natural Resources is the lessor of the property and the judicial branch is lessee.

■ When read together, the above statutes provide DNR with a broad grant of authority to purchase land for the State before December 31, 1994 for any purpose by means of a lease-purchase agreement, as long as the agreement is subject to annual appropriation, the lessor is DNR and the lessee is ACS. The court finds that the plain meaning of the above statutes provides DNR with the authority to enter into the ACS/DNR lease-purchase agreement.

## RENOVATION FUNDS IN ESCROW

3. Whether the procedure of placing funds in escrow for the renovation of the Anchorage Times Property violates article IX, section 13 of the Alaska Constitution where the funds are not subject to legislative appropriation.

Article IX, section 13 of the Alaska Constitution provides in relevant part:

No money shall be withdrawn from the treasury except in accordance with appropriations made by law.

CG argues that funds placed in trust by VECO for the renovation of the Anchorage Times Property are "program receipts" which must be placed in the state treasury and subject to the Legislature's powers of appropriation. The State responds that if VECO had made the improvements ACS requires and had incorporated the costs of the renovation into the total price of the lease, there would be no dispute and that legally the funds would not belong to ACS.

Pursuant to AS 36.30.080(c), ACS' notice to the Legislature of its intention to enter into a lease-purchase of the Anchorage Times Property included notice that the property required $2.8 million in renovations. The Legislature specifically approved the cost of the lease-purchase and renovations to the building by enacting SB 247 into law (1994 SLA Ch. 75).

■ Commercial leases commonly require a landlord to make improvements. Where private funds are placed in trust for the renovation of a building subject to the lessee's instructions, the funds do not constitute unrestricted "program receipts" subject to deposit in the state treasury pursuant to AS 37.05.146. The renovation funds are not held in the name of the State. The funds held in trust are restricted by the terms of the contract, and may only be spent to renovate and improve the Property. The funds are not income, and cannot be spent at the unfettered discretion of ACS. Where ACS determines that certain improvements to the Property are necessary, ACS may make improvements. If the funds are spent to improve the Property, the Trustee, pursuant to the terms of the trust, will release the funds necessary to pay for the improvements.

The "renovation fund" does not provide ACS with unbridled authority to spend funds renovating the Anchorage Times Building. Renovation funds are limited to the amount

held in trust, and are subject to disbursement by the Trustee for improvements to the Property. In 1994, the Legislature approved spending $2.8 million as part of the agreement to lease-purchase the Anchorage Times Building. The $2.8 million renovation fund does not violate article IX, section 13 of the Alaska Constitution.

### Order

The court AFFIRMS the final decision of the Alaska Department of Natural Resources.

Done this 7th day of December, 1994.

Larry R. Weeks
Superior Court Judge.

## APPENDIX B

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA FIRST JUDICIAL DISTRICT AT JUNEAU

Case No. 3AN–94–4995 CI

### ORDER GRANTING APPELLEES' MOTION FOR ATTORNEY'S FEES

*MEMORANDUM AND ORDER*

### Introduction

This case comes before the court on the Appellees' Motion for Attorney's Fees. The appellees base their motion for attorney's fees on this court's previous Memorandum and Order dated December 7, 1994, where the court upheld a decision of the Commissioner of the Department of Natural Resources (DNR). The court's decision upheld DNR's decision which authorized the Alaska Court System (ACS) and DNR to proceed with the lease-purchase of the Anchorage Times Building in Anchorage. The appellant has opposed the appellees' motion, arguing that the appellant should be accorded public interest litigant status, and that no attorney's fees should be awarded to the appellees.

### Background

Until May 1, 1994, the Alaska Court System (ACS) leased and occupied property owned by Carr–Gottstein Properties (CG) in Anchorage. During 1993, ACS and DNR entered into a lease-purchase agreement for the purchase of the Anchorage Times Building, a building ACS determined would better suit its current and projected space requirements. The lease agreement provided that ACS would be the lessee, and that DNR would be the lessor. The terms of the agreement provided that ACS would make yearly lease payments to DNR. The agreement further provided that DNR would assign its rights to the yearly ACS payments to a trustee. In turn, the trustee would sell certificates of participation, entitling the holders of the certificates to a percentage share of the yearly lease payments made by ACS over the term of the lease.[1]

CG opposed the ACS/DNR lease-purchase. During the administrative proceedings, CG argued before DNR that the ACS/DNR lease-purchase violated the constitutional debt restriction in article IX, section 8 of the Alaska Constitution. DNR issued a final decision approving the lease-purchase on April 11, 1994. After DNR denied CG's Motion for Reconsideration, CG filed an appeal with this court. After a hearing on November 28, 1994, the court issued its decision affirming DNR's decision. The court found that the lease-purchase agreement did not create "debt" as prohibited by article IX, section 8 of the Alaska Constitution. The court upheld the ACS/DNR lease-purchase where the lease (1) contains a non-appropriation clause; (2) limits recourse to the leased property; and (3) does not create a long-term obligation binding future generations or Legislatures.[2]

The appellees argue that they prevailed on the main issue in the litigation, and should be awarded attorney's fees incurred during the appeal of this case. The appellees submit that they incurred attorney's fees of $33,-587.50 during this appeal. The appellees

---

1. A more detailed factual background regarding the ACS/DNR lease-purchase may be found in this court's Memorandum and Order dated December 7, 1994.

2. *Memorandum and Order*, 3AN–94–4995 CI at 20 (Alaska Superior Court 1994).

contend that the fees they incurred are reasonable in light of the "complex questions of first impression that this appeal presented." The appellees conclude that as a prevailing party on appeal, they are entitled to partial compensation for their attorney's fees.

The appellant opposes the Appellees' Motion for Attorney's Fees, arguing that the appellant raised important legal questions relating to the interpretation of the Alaska Constitution. The appellant concedes that the appellees prevailed on the main issue of the litigation. However, the appellant contends that as a result of this litigation, benefits many inure to the State in the form of favorable future interest rates. Accordingly, the appellant argues it should be accorded the status of a public interest litigant, and that since it litigated on behalf of the public interest, the appellees may not recover any attorney's fees. The appellant concludes that even if the court rejects the appellant's public interest litigant status, the court should only award reasonable attorney's fees pursuant to the analogous application of Civil Rule 82. The appellant notes that the appellees utilized outside counsel instead of any of the estimated 200 assistant attorneys general, and in addition, multiple attorneys worked on the case resulting in a duplication of efforts.

The questions presented by the above arguments of the parties are:

1. *Whether the appellant is entitled to the status of a public interest litigant, resulting in no award of attorney's fees to the appellees.*

2. *Whether the appellees were the prevailing parties in this appeal, and are entitled to attorney's fees pursuant to Rule of Appellate Procedure 508(e).*

*Discussion*
### PUBLIC INTEREST LITIGANT

1. *Whether the appellant is entitled to the status of a public interest litigant, resulting in no award of attorney's fees to the appellees.*

■ It is an abuse of discretion to award attorney's fees against an unsuccessful

public interest plaintiff who raises a claim in good faith. *Girves v. Kenai Peninsula Borough*, 536 P.2d 1221, 1227 (Alaska 1975); *Hunsicker v. Thompson*, 717 P.2d 358, 359 (Alaska 1986); *Anchorage Daily News v. Anchorage Sch. Dist.*, 803 P.2d 402, 404 (Alaska 1990). However, where "private stakes are high," a lawsuit may not be in the "genuine public interest." *Hunsicker v. Thompson*, 717 P.2d at 359, n. 2 (citing *Gold Bondholders Protective Council v. Atchison, Topeka and Santa Fe Railway*, 658 P.2d 776 (Alaska 1983)). A public interest litigant is a party who satisfies the following criteria:

(1) Is the case designed to effectuate strong public policies?

(2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring this suit?

(4) Would the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance?

*Loeb v. Rasmussen*, 822 P.2d 914, 921 n. 18 (Alaska 1991); *Keane v. Local Boundary Comm'n*, 893 P.2d 1239 (Alaska 1995).

■ The litigation in this case appears to have been initiated based on the commercial real estate interests of CG. CG appeared before DNR in opposition to DNR and ACS's proposal to lease purchase the Anchorage Times building. If CG had succeeded in this litigation, the primary beneficiary would have been CG, and CG may have been able to offer ACS a new lease agreement on the building ACS had been leasing from CG. It is true, as CG argues, that litigation of novel questions of constitutional law may benefit a broad range of people and interests. *Girves*, 536 P.2d at 1227. However, that proposition is true for each incremental advancement of the stare decisis process.

In this case, CG had a significant financial incentive to initiate litigation both before DNR and in this court. *See generally Murphy v. City of Wrangell*, 763 P.2d 229 (Alaska 1988). *But compare Keane*, 893 P.2d at 1250–51. Even though ACS let the lease of CG's property expire and began vacating the

premises, CG may have had an opportunity to attract ACS again as a tenant if the appellees had not prevailed. At the origin of this lawsuit before DNR, CG had potentially hundreds of thousands of dollars at stake. The court finds that CG had a significant financial interest in this litigation, and denies the appellant public interest litigant status.

### ATTORNEY'S FEES AWARD TO PREVAILING PARTY

*2. Whether the appellees were the prevailing parties in this appeal, and are entitled to attorney's fees pursuant to Rule of Appellate Procedure 508(e).*

The Alaska Supreme Court defines the prevailing party as follows:

> [T]he prevailing party to a suit is the one who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of the original contention. He is the one in whose favor the decision or verdict is rendered and the judgment entered.

*Tobeluk v. Lind,* 589 P.2d 873, 876 (Alaska 1979) (quoting *Buza v. Columbia Lumber Co.,* 395 P.2d 511, 514 (Alaska 1964)).

The main issue in this litigation was whether the ACS/DNR lease violated the debt restriction provision of article IX, section 8 of the Alaska Constitution. The appellant does not dispute that the appellees prevailed on the main issue of this litigation. The court affirmed the lease-purchase agreement, and ACS and DNR proceeded by implementing the lease based on this court's ruling. The remaining question is what reasonable attorney's fees should be awarded to the appellees as prevailing parties.

 An award of attorney's fees in an appeal of an agency decision to superior court is governed by Rule of Appellate Procedure 508. Appellate Rule 508 provides in relevant part:

> (e) Attorney's Fees. Attorney's fees may be allowed in an amount to be determined by the court. If such an allowance is made, the clerk shall issue an appropriate order awarding fees at the same time that an opinion or an order under Rule 214 is filed. If the court determines that an appeal or cross-appeal is frivolous or that it has been brought simply for purposes of delay, actual attorney's fees may be awarded to the appellee or cross-appellee.

An award of attorney's fees pursuant to Appellate Rule 508(e) ordinarily "should only partially compensate the prevailing party for attorney's fees." *State Public Employees Retirement Board v. Cacioppo,* 813 P.2d 679, 685 (Alaska 1991) (quoting *Kenai Peninsula Borough v. Cook Inlet Region, Inc.,* 807 P.2d 487 (Alaska 1991)). In awarding attorney's fees pursuant to Civil Rule 508(e), a court may exercise its sound discretion to award attorney's fees which are justified and reasonable. *Cacioppo* at 685 (citing *Stevens By Park View Corp. v. Richardson,* 755 P.2d 389, 396 (Alaska 1988)).

The court has reviewed the billing summaries submitted by the appellees in support of their motion for attorney's fees. The billing summaries reflect that the appellees expended a total of 235.6 total hours of attorney and paralegal time on this appeal, for a total value of $33,587.50. The appellees utilized paralegals for a total of 70.7 hours, or 30% of the total hours expended. In addition, the court notes that the record was lengthy, the issue was one of first impression, and the case was fully briefed by both parties.

 The appellant argues that where a party appeals an administrative agency decision, but receives no money judgement, the guidelines in Civil Rule 82(b)(2) may be applied by analogy to Appellate Rule 508(e) to determine a reasonable award of attorney's fees. The appellant argues that an award of attorney's fees pursuant to Civil Rule 82(b)(2) would result in an award of 20% of $33,587.50, or $6,717.50.

*Order*

The court agrees that $6,717.50 is commensurate with the complexity of the issues, the

briefing and the magnitude of the lease-purchase at stake in this appeal.

Larry R. Weeks
Superior Court Judge.