STATE EX REL. NEVADA BUILDING AUTHORITY, RELATOR, v. WILLIAM E. HANCOCK, SECRETARY OF THE NEVADA BUILDING AUTHORITY, RESPONDENT.

No. 6157

April 21, 1970                    468 P.2d 333

*Russell W. McDonald* and *Frank W. Daykin,* of Carson City, for Relator.

*Harvey Dickerson,* Attorney General, and *Robert A. Groves,* Deputy Attorney General, for Respondent.

## OPINION

By the Court, Thompson, J.:

This proceeding in mandamus tests the constitutionality of ch. 448 [1969] Stats. of Nev. 778 in the light of Nev. Const.

art. 9, § 3 limiting the public debts of Nevada to one percent of the assessed valuation of the State.

The relator, Nevada Building Authority, was created by the mentioned statute. It is designated therein as a body corporate and politic. Its members consist ex officio of the members of the State Planning Board, and the manager of the latter Board is the secretary of the Authority and the respondent to this proceeding.

The legislature through ch. 448 directed the Nevada Building Authority to build and provide facilities for use by the State and its agencies and empowered it to acquire real property and issue securities for this purpose. Accordingly, the Authority adopted a resolution declaring its intention to issue securities in the amount of $5,600,000 to construct an athletic field and an education building on the campus of the University of Nevada at Las Vegas, and a chemistry building and an education building on the University of Nevada campus at Reno.

The securities were to be issued in any convenient denomination or denominations and were to mature at any convenient time or times not later than 50 years from their respective dates of issuance. The resolution further specified that "[t]he bonds will not constitute an obligation of the State of Nevada or of the University of Nevada System or any other using agency, and are payable solely from the income of the Authority." That income would be derived from charges, fees or rentals for the use of the buildings or facilities and would be sufficient to service the securities issued. The resolution thus passed was authorized by several of the provisions of ch. 448.

The respondent, as secretary of the Authority, was directed to cause to be published the declaration and other matters relating thereto. He refused to do so, and this proceeding to compel action was commenced.

The assessed valuation of the State of Nevada for fiscal year 1969–70 was $1,708,027,706, one percent of which is $17,080,277. The State debts subject to the one percent constitutional limitation amounted to $15,711,000 as of January 1, 1970, leaving an unused limitation as of that date in the amount of $1,369,277. The respondent declined to comply with the directive of the Building Authority since the bonds proposed for the University building program when added to the bonds outstanding and authorized constitute debts in excess of the constitutional limit. It is conceded that the proposed bonds do not fall within either of the specific exemptions provided by the constitution which relate respectively to the public defense and to the State's property and natural

resources. Nev. Const. art. 9, § 3; State ex rel. State Gen. Oblig. Bond Comm'n v. Koontz, 84 Nev. 130, 437 P.2d 72 (1968); Marlette Lake Co. v. Sawyer, 79 Nev. 334, 383 P.2d 369 (1963). Moreover, it is agreed that the remedy of mandamus is appropriate. State ex rel. State Gen. Oblig. Bond Comm'n v. Koontz, supra; Marlette Lake Co. v. Sawyer, supra.

1. "The state may contract public debts; but such debts shall never, in the aggregate, exclusive of interest, exceed the sum of one percent of the assessed valuation of the state. . . ." So reads the relevant part of Nev. Const. art. 9, § 3. In an effort to avoid the debt limit thus imposed and to provide essential public facilities, the legislature enacted ch. 448.[1] The relator contends that the statutory scheme for the construction of public facilities is constitutionally permissible since public debts within the meaning of the constitutional proscription are not created. This contention requires our dissection of the statute and its implications.

a. Initially, we must consider the nature of the Authority created. Meaningful differences exist between a public operating authority on the one hand, and a public building authority on the other. An operating authority normally retires its debt with revenue received from nongovernmental commercial users of the facility in question. This is not the case with a building authority since it normally finances the construction project by borrowing funds, renting its completed project to a state agency or unit of government, and repaying its debt out of the rent received. It is apparent that a building authority is truly a part of the government since it is managed by public officials and its income depends upon governmental appropriations for rent.

The Authority created by ch. 448 is a building authority. It is designated as such, and the significant provisions with regard to financing proposed public construction are in line with the usual building authority schemes. For example, Sec. 12 requires each bond issued by the Authority to "state upon its face that it is payable solely from revenues derived from the operations of buildings or facilities . . . or from the income to be derived from rental leases . . . or both . . . [and] that it does not constitute an obligation of the State of Nevada, or of any department, board, commission or agency

---

[1] In 1968 the voters of this State defeated a proposed constitutional amendment to increase the debt limit from one percent to three percent. The measure failed by 10,679 votes, 67,071 to 56,392.

thereof. . . ." Thus, the bonds contemplated are not general obligation bonds of the State to which is pledged the full taxing power. Instead, the debts to be incurred are for self-liquidating projects to be serviced as to principal and interest entirely from revenues generated by the project itself.

Sec. 8 provides, however, that rentals payable from a state agency may be derived from legislative appropriations made in each biennium, or the legislature may pledge itself to make future appropriations for rent, either in full or to the extent not defrayed by revenues. These provisions are the essence of the financing scheme. The permissive word "may," used with regard to legislative appropriations for rent, cannot serve to disguise the basic character of the scheme. Without question the legislature will appropriate the needed funds. If it did not do so, the contemplated public construction for state agency use could not proceed.

Accordingly, we are compelled to conclude that the Building Authority created by ch. 448 is truly a state agency governed ex officio by members of the State Planning Board, serving neither private customers nor commercial income, formed to construct public buildings for use by state agencies and deriving its income from governmental rents. It is a creature of the legislature and can be dissolved by the legislature whenever it so desires, causing all of its assets to revert to the State. Government funds are thus channeled for payment of the bonds issued by the Authority. See State v. Volusia County School Bldg. Authority, 60 So.2d 761 (Fla. 1952); Hively v. School City of Nappanee, 169 N.E. 51 (Ind. 1929); State ex rel. Public Institutional Bldg. Authority v. Griffith, 22 N.E. 2d 200 (Ohio 1939); Reynolds v. City of Waterville, 42 A. 553 (Me. 1898). The creation of a separate body corporate does not alter the essence of the scheme. Ayer v. Commissioner of Admin., 165 N.E.2d 885 (Mass. 1960); State v. Yelle, 289 P.2d 355 (Wash. 1955); State Office Bldg. Comm'n v. Trujillo, 120 P.2d 434, 440 (N.M. 1941). We therefore reject as unrealistic the relator's contention that the Nevada Building Authority is somehow to be considered an entity entirely separate and apart from the State.

Subordinately, the relator contends that the financing proposal embodied in ch. 448 is nonetheless constitutionally sound. The proposal does not create state debts, according to the relator, since it falls within recognized exceptions to the constitutional proscription. We do not agree, and turn briefly

to discuss these exceptions and our reasons for finding them inapposite to the issue before us.

b. The "special fund" exception. As already stated, Sec. 12 contemplates that the bonds shall be serviced from revenues generated by the project itself. To the extent that such revenues are derived from a nongovernmental source, or from rentals paid by a state agency which in turn derives rent paying income from user fees, a State public debt within the meaning of the constitution is not created. The nongovernmental user supplies the special fund from which the bondholders receive their pay, and the Authority merely acts as an agent to collect the revenues. See Quill v. City of Indianapolis, 23 N.E. 788, 790 (Ind. 1890); Attorney Gen. ex rel. Eaves v. State Bridge Comm'n, 269 N.W. 388 (Mich. 1936), where the bonds were serviced by revenues supplied by the users of a toll bridge; McClain v. Regents of the University, 265 P. 412 (Ore. 1928), where the bonds for the construction of a university dormitory were to be paid from rentals charged student users; State v. New Mexico State Authority, 411 P.2d 984 (N.M. 1966), where the bonds for the construction of a state park were to be paid from user fees. In such a case the nongovernmental user is the debtor rather than the State.

This exception simply is not available if the government obligates itself to contribute to the fund—to supplement it with tax receipts since, in such case, the government has exceeded its role as a mere collection agent and has undertaken partial, or perhaps full payment of the debt. See State Office Bldg. Comm'n v. Trujillo, supra, at 444, 445 (N.M. 1941); State v. Yelle, supra. As heretofore stated, the financing proposal of ch. 448 contemplates, indeed requires, legislative appropriations if public construction is to go forward. The special fund exception is, therefore, inapplicable.

c. The "earned installment" doctrine, or the "executory contract" exception. The relator argues that should the legislature pledge itself to make future appropriations for rent in order to service the bonds issued by the Authority, such a pledge would fall within the executory contract exception and thereby avoid the constitutional debt limit. The essence of this doctrine is that a debt is not created until the consideration has been furnished. Accordingly, so the relator's argument goes, were the legislature to pledge itself to make future

appropriations for rent as authorized by Sec. 8, a debt within art. 9, § 3 is not created since the rentals to be paid by the state agency leasing the facility out of such appropriated funds do not become debts until and as the building is used. In short, a debt is not created at the time the legislative pledge is made.

Such a legislative pledge presents this question. Is the pledge to be deemed one for the aggregate amount over the period of the duration of the long term lease to the state agency, or merely a pledge for the amount due on the biennium's allocable portion of the aggregate? In our view, realism demands that the indebtedness is immediately created for the aggregate amount required by the period of the pledge. Were the State to pledge its taxing power as security for the bonds payable in the future, such a pledge would fall squarely within art. 9, § 3. Surely a pledge to make future appropriations for rent out of tax revenues must be similarly treated. A present debt is created by such a legislative pledge. To view the matter otherwise would exalt form over substance and impair the integrity of our constitutional government.[2]

d. The "current revenue" doctrine. The legislative appropriations for rent may, under Sec. 8, be for a single biennium as contrasted with a legislative pledge to appropriate funds for rent during the full term of the lease and of the bonds issued by the Authority. Normally, there is no constitutional concern with expenses payable out of current revenue. Such expenses are not debts within art. 9, § 3. State ex rel. Ash v. Parkinson, 5 Nev. 15 (1869). The constitutional concern is to limit commitment of future revenues. Therefore, argues the relator, successive biennial appropriations for rent are to be equated with expenses of government payable out of current revenue, and for that reason, are not countable against the State debt limit. The argument carries some persuasive force. Within the context of the public building program involved, however, it is our view that successive biennial appropriations for rent until the bonds issued by the Authority are fully retired must be considered in the same light as a legislative pledge to make future appropriations for the same purpose. It is inconceivable that the legislature would default in either

---

[2]The case of Walla Walla v. Walla Walla Water Co., 172 U.S. 1 (1898), the leading decision on the executory contract exception upon which the relator relies, has application only where there is no express agreement to appropriate money in the future.

instance since the good faith of Nevada would not allow it. See also State Office Bldg. Comm'n v. Trujillo, supra, at 448.

2. Ch. 448 is an amendment to Title 27 of NRS and is subject to the rule of severability. See Vol. 1 NRS, p. XXIII, § 6. We are unable to separate the financing provisions of the Act. They are inextricably intertwined. We hold that the financing proposal of ch. 448, when considered as a whole, falls within the proscription of Nev. Const. art. 9, § 3, and is unconstitutional. The petition for mandamus is denied, and this proceeding is dismissed.

COLLINS, C. J., ZENOFF, BATJER, and MOWBRAY, JJ., concur.