**John EDGERLY, Tax Collector of City of Augusta**

v.

**HONEYWELL INFORMATION SYSTEMS, INC.**

Supreme Judicial Court of Maine.

Aug. 24, 1977.

---

1. The genuineness of the signature as that of Myra A. Noble on the comparison documents is not disputed.

Sanborn, Moreshead, Schade & Dawson by Richard B. Sanborn, Augusta, for plaintiff.

Locke, Campbell & Chapman by Joseph B. Campbell, Augusta, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

POMEROY, Justice.

"All real estate within the State, all personal property of residents of the State and all personal property within the State of persons not residents of the State is subject to taxation on the first day of each April as provided; and the status of all taxpayers and of such taxable property shall be fixed as of that date." 36 M.R.S.A. § 502.

The City of Augusta, acting agreeably to this statute it says, assessed taxes on what it claims was the personal property of Honeywell Information Systems, Inc. for the tax years 1973–1974.

That is the genesis of this controversy.

The computer equipment on which the personal property taxes were assessed against Honeywell was used by the State of Maine in the operation of state government. Honeywell denies liability for any part of the taxes so assessed.

The tax collector commenced a civil action against Honeywell pursuant to 36 M.R.

S.A. § 1031. Upon answer being filed and discovery completed, the cause was referred to a referee by agreement of the parties. The right to object to the referee's report was expressly reserved to both parties. The referee's report, recommending the entry of judgment for the defendant, was accepted by the justice of the Superior Court over objections of plaintiff. This seasonably filed appeal followed.

We deny the appeal.

■ At all times, the appellant has contended that Honeywell is barred from asserting the claim that it has no liability for the taxes assessed because it failed to proceed by petition for abatement under 36 M.R.S.A. § 841. Suffice it to say, in answer to this contention, it is not claimed by Honeywell there was overvaluation of the property. Rather, its position is that the assessment of the tax against it was completely void since the equipment taxed was the property of the State of Maine on April 1, 1973. That being so, abatement procedure is not available to it. *Berry v. Daigle*, Me., 322 A.2d 320 (1974); *Talbot v. Inhabitants of Wesley*, 116 Me. 208, 100 A. 937 (1917); *Herriman v. Stowers*, 43 Me. 497 (1857).

While at first blush the issue before us appears to be simple, its resolution requires an analysis of a contract between the State of Maine and Honeywell and action taken by the legislature with respect to the creation of data processing services for the state government.

Decisive is whether title to the computer equipment on which the personal property tax was assessed was lodged in the State of Maine prior to April 1, 1973 by reason of a contract between the state and Honeywell dated March 2, 1972, and happenings subsequent thereto.

In 1969 the legislature indicated its interest in computer services by directing that:

"The Commissioner of Finance and Administration, through the State Purchasing Agent or such other agent as he may choose, shall conduct a thorough review of all types of equipment owned, leased or otherwise available to the several departments and agencies of the State, regardless of the source of supporting funds, with the intention of combining their use, providing centralized facilities, or of eliminating existing equipment and facilities, as he believes to be in the most economical, most efficient and best interests of the State." P. & S.L.1969, c. 154 & c. 197.

In the same year the legislature established such a service by providing:

"Central data processing service. To establish and conduct central data processing and information services at the seat of government. Such services shall be available to all departments and agencies of government. The State Controller is empowered to make appropriate charges to those departments and agencies of government making use of the equipment, services, personnel and supplies of the central facility." P. & S.L. 1969, c. 251, § C.

In 1941, by c. 76 of the Private & Special Laws, the legislature created the Maine State Office Building Authority. The need was felt to be great for the erection of a building, in addition to the State Capitol Building, from which the numerous departments of the state could operate. The cost of such building was to be several million dollars. The constitution of Maine, art. IX, § 14, contains a provision prohibiting the legislature from creating any debt or debts, liability or liabilities, on behalf of the state which, singly or in the aggregate with previous debts or liabilities, would exceed two million dollars. The proposal was, simply stated, that the Maine State Office Building Authority, an agency of the State of Maine, was to acquire the land and erect an office building or an addition to the State House. Section 9 of the act provided that the Building Authority should issue notes, bonds, or other evidences of indebtedness, for terms of not more than thirty years. Section 12 of the act provided that the Authority should execute a lease to the State of Maine "of the entire property for a rental so computed as shall provide for the

payment of interest upon the bonds and notes or other evidences of indebtedness hereinbefore provided for and for their ultimate retirement."

The Senate, acting pursuant to art. VI, § 3 of the constitution, propounded questions to the justices of the Supreme Judicial Court. The answers of the justices established that

(1) "A contract which obligates the State to pay money over a period of years for the purchase of property, creates a liability. It makes no difference whether you call the payments the State is obligated to make rental or installments on the purchase price, the legal effect is the same."

and

(2) "One Legislature cannot obligate succeeding Legislatures to make appropriations. One Legislature may, within constitutional limitations, impose a contractual obligation upon the State which it is the duty of the State to discharge; but one Legislature cannot impose a legal obligation to appropriate money upon succeeding Legislatures."

*Opinion of the Justices,* 146 Me. 183, 189–90, 79 A.2d 753, 756 (1951).

Undoubtedly, the Commissioner of Finance and Administration and others acting on behalf of the state had these constitutional principles, so recently described by the court, in mind when they set out to negotiate with Honeywell for the computer services.

These policy decisions had been made and had legislative approval:

(1) A central computer service should be established.

(2) Such computer service should be under the operational control of the Bureau of Accounts and Control.

(3) The expense of the central computer service should be funded, not with money appropriated to the Bureau of Accounts and Control from the general fund, but from charges which the State Controller, as head of the Bureau of Accounts and Control, is empowered to exact from those state departments and agencies making use of the equipment, services, personnel, and supplies of the computer center.

(4) The central data processing center was to be self-supporting, i. e., capable of performing those functions with funds recovered in the form of service charges paid by the using departments and agencies, which funds were to go into a special revenue account set up for the funding of the activities of the center.

█ In pursuance of these policy decisions, the Central Computer Service was established and equipped with equipment acquired from Radio Corporation of America. There came a time when the RCA equipment became inadequate by reason of the increased demand for greater capacity. The Commissioner of Finance and Administration submitted invitations to bid and specifications prepared by Central Computer Services to obtain the necessary equipment. Although in the usual case, equipment is acquired by the Bureau of Purchases on requisitions submitted by the various agencies of the government, we find no violation of the purchasing statutes, 5 M.R. S.A. §§ 1811–20, in the procedure used in this case. Appellant's argument to the contrary fails for lack of merit.

The contract which was finally entered into on March 2, 1972 is replete with words and phrases indicative of an intention to contract for a purchase rather than a lease. The first unnumbered paragraph provides that "Honeywell agrees . . . to sell" and "the State hereby purchases" the equipment. Paragraph 15 provides in effect that the day the equipment passes the standard of performance (discussed infra) is the last day the risk of loss and damage remains with Honeywell.[1] Paragraph 19(a) refers to the equipment as being "sold." Paragraph 19(b), dealing with the method of billing additional charges, refers to the "sale" hereof. Perhaps the most significant

---

1. The state did in fact place the requisite insurance coverage on March 31, 1973.

sentence is found in paragraph 19(c) which states, "Title to the items of equipment furnished under this Agreement shall pass to the State on the date such equipment is installed, made ready for use and has passed the standard of performance." The next sentence reserves a security interest in Honeywell "in each unit of equipment sold hereunder." Paragraph 20(b) obligates Honeywell to provide maintenance service on the equipment "purchased hereunder."

While the language of these provisions is significant, "[t]he real character of the instrument is not determined from its technical form, but from the intention of the parties as gathered from the four corners of the contract." *See Kolb v. Golden Rule Baking Co.*, 222 Mo.App. 1968, 9 S.W.2d 840 (1928).

> "We must gather the intention of the parties from the entire instrument without regard to its form, or technical terms used therein, *Kolb, supra,* in the light of the nature of the transactions, the situation and relationship of the parties, and the purposes sought to be achieved by them."

*RCA Corporation v. State Tax Commission of Missouri,* Mo., 513 S.W.2d 313, 316 (1974).

■ Simply stated, the intention of the parties manifested by a fair reading of the entire contract was that Honeywell was to install the equipment on the premises and to furnish the necessary training personnel. The equipment was to undergo a testing period of thirty consecutive calendar days. If the equipment operated at an average level of effectiveness of 90% or more for a period of thirty consecutive calendar days from the commencement date of the performance period, it was to be deemed to have met the state's standard of performance and constitute a successful performance period. The contract further provided that "immediately upon successful completion of the performance period, the State shall notify Honeywell in writing of acceptance of the equipment and authorize the payment to begin on the first day of the successful performance period." The cost of the equipment was to be paid in install-

ments from moneys paid into the special revenue account only after moneys appropriated by the legislature to the users of the equipment had been paid into the account. There was specific provision that the state could return the equipment to Honeywell and be no longer liable for payments if ever the future legislatures failed to make the necessary appropriations. It is this latter provision, which one witness before the referee characterized as the "chicken out" provision, that we see as distinguishing this case from that presented in the *Opinion of the Justices, supra,* which caused the justices to declare that one legislature cannot obligate succeeding legislatures to make appropriations and that a contract which *obligates* the state to pay money over a period of years for the purchase of property creates a liability. We see no constitutional violation resulting from this contract.

■ The parties agreed that although the essential working units of the equipment were in place on February 20, 1973, the test period should commence March 2, 1973. The appellant contends that even if title to the equipment was intended to pass to the state and thus make it exempt from taxation, in fact by the terms of the contract title could not have passed prior to April 1, 1973.

We endorse and adopt the reasoning of the referee on this point when he said in his report:

> "The parties agreed to make March 2, 1973 the first day of the test period. It follows that March 31, 1973 was the 30th 'consecutive calendar day' and therefore the last day of the test period under the contract. On March 30, 1973 it was apparent to the parties that the computer had already met the performance test since its efficiency for 29 days had been such that it would more than attain the required average even if it became inoperable and remained so during the following day. Since the test was run for the benefit of the State, the State could have waived further testing and declared the performance requirement met. It did not elect to do so and testing continued until

9:10 P.M. on March 31, 1973. The test had been run continuously on work supplied by the State and necessary to its operations. At 9:10 P.M. all such work had been completed and there was nothing more for the computer to do on that workday. The operation ceased at that moment with the consent of the State and the 'successful performance period' ended. At that moment title passed as provided by contract. The parties certainly did not intend an absurd construction of their contract such as would be the result if it were concluded that the computer had to be kept operable until midnight but not operating because the State had nothing for it to do. The vendor was entitled to written acceptance and retroactive authorization of payments 'immediately upon successful completion of the performance period' in accordance with the contract, but passage of title was conditioned upon successful performance, not the delivery of the written recognition that that event had occurred. The passage of title was not deferred by the fact that the parties for their mutual convenience arranged for delivery of the written acceptance on Sunday, April 1, 1973. Nor was passage of title affected or delayed by the mere fact that the parties agreed to treat a day for accounting and monitoring testing as running from 8:00 A.M. to 8:00 A.M. This orderly and practical method of accounting was not intended by the parties to alter the contractual provision that the test period ended on the 30th 'calendar' day. I conclude and find that title passed to the State on March 31, 1973."

We conclude that although the state's title to the equipment was defeasible in the event of a happening of a condition subsequent—i. e., failure of the legislature to appropriate—for the purposes of taxation, title ultimately came to the State of Maine on March 31, 1973.

Such was the clear intention of the parties.

There is no legal impediment to giving full force and effect to such intention.

"The law seems well settled that where one receives goods and chattels of another on a contract, by which he has a right to return them or pay a stipulated price for them, the property passes and he is regarded as the purchaser." *Frye v. Burdick*, 67 Me. 408, 411 (1877).

*See also*, Annot., 52 A.L.R. 589, 595–96 (1928).

This being true, on "doom"[2] day, i. e., April 1, 1973, and at all times subsequent thereto, the computer equipment sought to be taxed by the City of Augusta to Honeywell was exempt from taxation as "property of the State of Maine." 36 M.R.S.A. § 651.

The entry must be:

Appeal denied.

All Justices concurring.

---

**2.** *See Sweetsir v. Chandler*, 98 Me. 145, 56 A. 584 (1903).