BUSINESS COMPUTER RENTALS, A NEVADA CORPORATION, PETITIONERS, *v.* STATE TREASURER, ROBERT L. SEALE, RESPONDENTS.

No. 30426

January 22, 1998                    953 P.2d 13

*Frank W. Daykin,* Carson City, for Petitioner.

*Frankie Sue Del Papa,* Attorney General, and *Randal R. Munn,* Senior Deputy Attorney General, Carson City, for Respondent.

## OPINION

*Per Curiam:*

This original petition seeks a writ of mandamus directing the State Treasurer to make payments under a computer lease purchase agreement. For the reasons discussed herein, we grant the petition.

On May 1, 1997, respondent, the State Treasurer, entered into a written lease purchase agreement with petitioner, Business Computer Rentals ("BCR"), for a Gateway computer. The agreement contains a schedule of base payments, with the first payment due on May 6, 1997. Although the State Treasurer wishes to proceed with the lease agreement, he has refused to make the first payment. His refusal to pay is based upon advice from the Attorney General's Office that the lease purchase agreement could create a public debt in violation of the Nevada Constitution. As a result of the State Treasurer's refusal to pay, BCR has filed the instant writ petition.

The primary issue presented in this petition is whether the lease purchase agreement constitutes ''public debt'' and therefore falls within the ambit of article 9, section 3 of the Nevada Constitution. This provision states, in relevant part, as follows:

**State indebtedness: Limitations and exceptions.** The state may contract public debts; but such debts shall never, in the aggregate, exclusive of interest, exceed the sum of two percent of the assessed valuation of the state . . . except for the purpose of defraying extraordinary expenses, as hereinafter mentioned. Every such debt shall be authorized by law for some purpose or purposes, to be distinctly specified therein; and every such law shall provide for levying an annual tax sufficient to pay the interest semiannually, and the principal within twenty years from the passage of such law, and shall specially appropriate the proceeds of said taxes to the payment of said principal and interest; and such appropriation shall not be repealed nor the taxes postponed or diminished until the principal and interest of said debts shall have been wholly paid. Every contract of indebtedness entered into or assumed by or on behalf of the state, when all its debts and liabilities amount to said sum before mentioned, shall be void and of no effect, except in cases of money borrowed to repel invasion, suppress insurrection, defend the state in time of war, or if hostilities be threatened, provide for the public defense.[1]

The lease agreement at issue here provides a schedule of base payments for the computer—two payments of $646.59 in 1997, two such payments in 1998, and two such payments in 1999. Several clauses in the agreement are pertinent to the issue at hand. First, section 2.1(b) states that ''[n]either the execution and delivery of this Agreement or any Property Schedule or the consummation of the transactions contemplated hereby or thereby . . . conflicts with or results in a violation of any provision of law governing the Governmental Representative or the State.'' Section 2.1(e) states as follows:

The State has never defaulted under any bond, note,

---

[1]As explained in Constitutionality of Chapter 280, Oregon Laws 1975, 554 P.2d 126, 128-29 (Or. 1976), constitutional debt limitations were enacted primarily as a response to heavy borrowing by many states prior to 1840. These states financed internal and banking improvements and, after the depression of 1837, many defaulted on their obligations. States entering the union after 1840 (including Nevada) invariably included debt limitations in their constitutions. Such control over debt creation precluded carelessly imposed tax liabilities. *See* Robert Bowmar, *The Anachronism Called Debt Limitation,* 52 Iowa L. Rev. 863, 873 (1967).

■

warrant, debt obligation, agreement, or under any contract similar to this Agreement. The Governmental Representative anticipates having sufficient moneys to pay, and that will be available and used for payment of, regardless whether moneys are hereafter budgeted therefor, an amount equal to that portion of the Base Payments set forth in each Property Schedule when the same becomes due for the remainder of the current Fiscal Year of the State.

Section 3.2 governs the term of the agreement and states that it shall terminate upon the earliest to occur of any of the following events: (a) the Government Representative's exercise of the prepayment option; (b) "[a]n Event of Default by the Governmental Representative or the State under Article XII of this Agreement;" (c) the full payment of all base payments and all other amounts required to be paid under the agreement; or (d) "[t]he termination of a Loan by the Governing Body in accordance with Section 3.3 of this Agreement." Section 3.3 concerns the legislature's nonappropriation of funds and states, in part, as follows:

> *Nonappropriation.* Any Loan shall terminate upon the occurrence of an Event of Nonappropriation[2] with respect thereto on the last day of the Fiscal Year preceding the Fiscal Year to which such Event of Nonappropriation relates. The Governmental Representative shall give notice to [BCR] of such Event of Nonappropriation and the Fiscal Year to which it relates as quickly as is practical . . . . In the event of termination of a Loan as provided in this Section, the Governmental Representative shall comply with the instructions received from the Corporation in accordance with Section 12.7 within ten (10) days after the termination of such Loan Term.

Section 3.5 clarifies that upon the loan's termination for nonappropriation, the government is no longer responsible for base payments:

> Upon termination of a Loan as provided in Section 3.3, neither the Governmental Representative nor the State shall

---

[2] "Event of Nonappropriation" is defined in Article 1 as "the failure of the [state legislature] to appropriate money for any Fiscal Year sufficient to pay the Base Payments payable during such Fiscal Year with respect to such Property Group and to pay all other amounts required to be paid to meet all obligations of the Governmental Representative." Section 12.7 provides that upon the termination of a loan before all base payments are made, the government representative must return the property, in good repair, working order and condition, as directed by BCR.

be responsible for the payment of Base Payments relating thereto coming due in succeeding Fiscal Years, but if the Governmental Representative has not delivered possession of the related Property Group to [BCR] . . . the termination shall nevertheless be effective, but, subject to the availability of appropriated funds, the Governmental Representative shall be responsible for the payment of the portion of the Base Payments that would have thereafter come due during the period which the Governmental Representative continues to use the Property Group and for any other loss suffered by [BCR] as a result of the Governmental Representative's failure to take such actions as required.

As a preliminary matter, we note that although mandamus is generally not appropriate in the face of effective alternative remedies, extraordinary relief may be granted where the circumstances reveal urgency or a strong necessity. Jeep Corp. v. District Court, 98 Nev. 440, 652 P.2d 1183 (1982). Additionally, where an important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction, our consideration of a petition for extraordinary relief may be justified. *See* Ashokan v. State, Dep't of Ins., 109 Nev. 662, 667, 856 P.2d 244, 247 (1993). This petition raises pressing issues involving the Nevada Constitution and the public policy of this state. Thus, although BCR could have pursued alternative avenues of relief, we conclude that our consideration of this petition is warranted.

We previously considered the Nevada Constitution's public debt limitation in State ex rel. Nevada Building Authority v. Hancock, 86 Nev. 310, 468 P.2d 333 (1970). *Hancock* addressed the constitutionality of a statutory financing scheme which used legislative appropriations to pay rent on state buildings, where the rent was used to pay off bonds sold to finance the buildings' construction. Specifically, the legislature created the Nevada Building Authority and directed the Authority to build facilities for state use. The Authority then declared, by resolution, its intention to construct buildings and athletic facilities on the University of Nevada campuses. The Authority's resolution explained that bonds would be issued to pay for the construction, and that payment on these bonds would be made solely from the Authority's income, which would be derived from fees and rent for the use of the buildings and facilities. The state would pay these fees and rent, since it would use the constructed facilities. Additionally, the resolution provided that the bonds would not

"constitute an obligation of the State of Nevada." *Id.* at 312, 468 P.2d at 335.[3]

We determined that this scheme created public debt in contravention of the Nevada Constitution. First, this court acknowledged that the contemplated bonds were not general obligation bonds to which the state had pledged its taxing power but instead were revenue bonds payable entirely from rent and fees generated by the buildings and facilities. Additionally, we noted that the rent payable from the state could be derived from legislative appropriations made each biennium, and that the legislature could pledge itself to make future appropriations for rent. This court concluded that even though this language seemed to give the legislature discretion with respect to future appropriations, "[w]ithout question the legislature will appropriate the needed funds. If it did not do so, the contemplated public construction for state agency use could not proceed." *Id.* at 314, 468 P.2d at 336. Further, this court determined that the Nevada Building Authority was in effect a state agency and was therefore not an entity separate from the state. *Id.*

In concluding that the scheme violated the Nevada Constitution's debt limitation provision, we rejected the recognized exceptions to the constitutional proscription.[4] Specifically, we determined that

> realism demands that the indebtedness [for rent and fees] is immediately created for the aggregate amount required by the period of the pledge. Were the State to pledge its taxing power as security for the bonds payable in the future, such a pledge would fall squarely within art. 9, § 3. Surely, a pledge to make future appropriations for rent out of tax revenues must be similarly treated. A present debt is created by such a legislative pledge. To view the matter otherwise would exalt form over substance and impair the integrity of our constitutional government.

---

[3]At the time *Hancock* was decided, the constitutional limitation on public debt was one percent of the state's assessed value. The available, unused debt amount was $1,369,277, and the project contemplated by the legislature was estimated to cost $5,600,000. This amount obviously would have exceeded the available debt limit. *Hancock,* 86 Nev. at 312, 468 P.2d at 335.

[4]These exceptions are the "special fund" exception, where revenues are derived from a nongovernmental source, the "earned installment doctrine," where executory contracts exist, and the "current revenue doctrine," where expenses are payable only out of current revenue. *Hancock,* 86 Nev. at 315-16, 468 P.2d at 337-38; *see* State of Nevada v. Parkinson, 5 Nev. 17 (1869) (concluding that expenses payable from current revenue are not public debt under the constitution).

> . . . [S]uccessive biennial appropriations for rent until the bonds issued . . . are fully retired must be considered in the same light as a legislative pledge to make future appropriations for the same purpose. It is inconceivable that the legislature would default in either instance since the good faith of Nevada would not allow it.

*Id.* at 316-17, 468 P.2d at 337-38. Thus, even though the scheme was set up so that bonds were sold by the Nevada Building Authority, the Authority was deemed to be, in effect, the state. Additionally, even though rent was payable from current appropriations, and the legislature ostensibly had discretion whether to appropriate funds in the future, we concluded that the legislature did not actually have such discretion and that the scheme implicated future state revenue.

Here, both BCR and the State Treasurer contend that the contractual arrangement presented does not implicate future revenue and therefore falls outside the scope of article 9, section 3. In particular, they both assert that the present situation is distinguishable from *Hancock* because of the lease purchase agreement's nonappropriation clause. According to them, since an expense payable from current revenue is not debt, and the agreement specifically provides that it terminates if the legislature makes no appropriation for a given fiscal period, the payments necessarily come from current revenue and therefore do not constitute public debt. They also point out that unlike the situation in *Hancock,* where the legislature retained control over the desired outcome, here, the State Treasurer cannot control the legislative appropriation process and cannot commit future revenues to payment. In other words, in the present case, the legislature has not "pledged" any state revenue; instead, the executive branch has contracted for the installment expenditure of currently appropriated funds.

We agree with BCR and the State Treasurer that the lease's nonappropriation provisions bring it outside the scope of Nevada Constitution article 9, section 3. The agreement's subject matter is fungible equipment, susceptible to repossession. Further, the contract clearly provides that payments are contingent on funds being appropriated by the legislature. The agreement automatically terminates if the legislature fails to appropriate sufficient funds for the payments, and in such a situation, BCR is entitled to repossess the equipment. Under the current revenue doctrine, no constitutionally proscribed public debt is created. Unlike the situation in *Hancock,* realism does not demand that "indebtedness . . . is immediately created for the aggregate amount

required by the period of the pledge." *Hancock,* 86 Nev. at 316, 468 P.2d at 337. Here, the legislature is not compelled to appropriate money in the future.[5]

Other states faced with an issue similar to that before us have determined that lease purchase agreements do not constitute public debt within the purview of constitutional restrictions. For instance, in Edgerly v. Honeywell Information Systems, Inc., 377 A.2d 104 (Me. 1977), the court considered whether an installment contract between the state and a computer company violated the state's constitution. The court recognized that a contract which obligated the state to pay money over a period of years to purchase property created a liability and that one legislature could not obligate succeeding legislatures to make appropriations. *Id.* at 107. In determining that no constitutional problem existed, the court focused on a contract provision that the state could return the computer equipment and no longer be liable for payments if future legislatures failed to make necessary appropriations. According to the court, this "chicken out" provision prevented the contract from creating an obligation for future legislatures and therefore, the contract did not fall within the scope of the constitution's debt limitation. *Id.* at 108.

Similarly, in State ex rel. Kane v. Goldschmidt, 783 P.2d 988 (Or. 1989), the Supreme Court of Oregon determined that a state law with provisions for certain financing agreements, including lease purchase agreements, did not violate the constitutional prohibition of public debt. The statute at issue required that the financing agreements be made solely from available funds and provided that "[i]n no circumstance shall the state be obligated to pay amounts due from any source other than available funds." *Id.* at 989. Further, the statute authorized the lender to repossess the property in the event that available funds were insufficient to make the payments. *Id.*

The court recognized that both the enabling legislation and the loan agreement provided that if the legislature appropriated insufficient funds to continue payments, then the state's obligation to make payments would terminate: "The state's promise of repayment is conditioned on the willingness of future legislative assemblies to appropriate the funds. The state does not promise that future legislatures will appropriate any funds. The lenders take the risk of nonpayment." *Id.* at 994-95. Further, the court determined that "the fact that the legislature may feel compelled to make payments in a future biennium out of the fiscal concern to

---

[5]We also recognize that governmental agencies often need flexibility in acquiring property, and lease purchase agreements and financing arrangements provide this flexibility.

protect its credit rating [did not] convert the state's 'obligation' into a legal one subject to [constitutional restrictions]." *Id.* at 995. Thus, the court concluded that the statute and proposed agreements authorized by the legislature did not constitute public debt. *Id.*; *see also* Reuven Bisk, *State and Municipal Lease-Purchase Agreements: A Reassessment,* 7 Harv. J.L. & Pub. Pol'y 521, 550 (1984) (concluding that nonappropriation clauses provide "an effective tool for encouraging lease-purchasing while meeting debt limitation safeguards").

We conclude that petitioner has demonstrated that a writ of mandamus is warranted. Such a writ is available to compel the performance of an act which the law requires as a duty resulting from an office, trust or station, NRS 34.160, or to control an arbitrary or capricious exercise of discretion. *See* Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981). Based upon the lease agreement's nonappropriation clause and provisions for repossession of the leased equipment, the Nevada Constitution's limitation on public debt is not implicated. Accordingly, as long as the contract is otherwise enforceable, the State Treasurer has an obligation to make the required payments under the lease agreement. We therefore grant the petition and direct the clerk of this court to issue a writ of mandamus directing the State Treasurer to make any base payments due under the lease agreement.