21 P.3d 628 (2001)
EMPLOYERS INSURANCE COMPANY OF NEVADA, A Nevada Mutual Insurance Company, Petitioner,
v.
STATE BOARD OF EXAMINERS, Respondent.
No. 37281.
Supreme Court of Nevada.
April 12, 2001.
*629 Frank W. Daykin, Carson City, for Petitioner.
Frankie Sue Del Papa, Attorney General, and Brett Kandt, Senior Deputy Attorney General, Carson City, for Respondent.
Before the Court En Banc.

OPINION
PER CURIAM.
This is an original petition for writ of mandamus challenging the decision of the State Board of Examiners ("Board") not to review the merits of a lease-purchase agreement ("agreement") between petitioner Employers Insurance Company of Nevada ("EICON") and the State Department of Administration Buildings & Grounds Division ("Division"), based on the Board's belief that the agreement is unconstitutional.
We conclude that the agreement does not create debt or lend the state's credit in violation of the Nevada Constitution and that the petition should be granted.

FACTS
In October 2000, EICON executed a twenty-year lease-purchase agreement with the Division for an office building in Carson City to house the State Department of Conservation and Natural Resources ("the Department").
Under the terms of the agreement, EICON proposes to lease an office building it owns located at 504 East Musser, Carson City, to the Division for use by the Department, which will make the lease payments under the agreement.
Section 3(b) of the agreement provides that the agreement terminates after twenty years unless the agreement terminates sooner by operation of its nonappropriation clause, by an event of default, or by the exercise of the purchase option under section 22(a).
Section 7(a)(v) of the agreement provides that the Department will request an appropriation from the legislature for each fiscal year to pay the lease payments and that the Division will support such a request.
Section 6 of the agreement is the nonappropriation clause. This section provides that the agreement terminates in any fiscal year for which the legislature chooses not to appropriate sufficient money to meet the lease payment terms. This section also provides that in the event of nonappropriation, the state and its agencies have no legal obligation to make further lease payments and that EICON has the right to retake the property.
Section 24(a) of the agreement contains a nonacceleration clause under which EICON has "no right under any circumstances to accelerate the maturities of the Base Rent payments or to otherwise declare any Base Rent not then past due or in default to be immediately due and payable."
Section 35(a) of the agreement provides that the state's legal obligations under the agreement "are subject to the legislature lawfully making an appropriation for the Department to pay the amount needed to fulfill the obligation and are binding upon [the state] only to the extent such an appropriation is made."
Section 22(a) of the agreement gives the state an option to purchase the property. The state may exercise its option during the term of the lease or after the Department has made all lease payments. If the Department makes all the lease payments under the agreement, the state shall be deemed to have exercised its option and the state is not required to make any additional payments to receive title to the property.
EICON expects to assign its right to receive the lease payments from the Department to a third-party trustee. Such an assignment *630 will be made "in order to facilitate the issuance of Certificates [of Participation under section 21(c) ] in the Base Rents payable hereunder, and [the state] agrees to reasonably cooperate with the Lessor in any such Certificate offering." Under this arrangement, the trustee will collect the lease payments from the Department and then distribute the proceeds from the payments, in proportional shares, to the holders of the certificates of participation.
Section 28 of the agreement provides that "[n]othing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between the Lessor and [the state]."
The Division submitted the agreement to the Board for review and approval for the first time in November 2000. The board declined to review or approve the agreement because of its concern over the constitutionality of the agreement. After declining approval on November 1, 2000, the Board then sought and obtained an opinion from the Attorney General's office explaining Nevada law with respect to the agreement.
After receiving the Attorney General's formal written opinion, which concludes that the agreement would create a debt in violation of Nevada Constitution Article 9, Section 3 and would result in the lending of the state's credit in violation of Article 8, Section 9, the Board declined to review the merits of the agreement for a second time on December 22, 2000.
EICON then filed this original petition for a writ of mandamus challenging the Board's refusal to review the merits of the agreement.

DISCUSSION
A writ of mandamus is available "to compel the performance of an act" by an inferior state tribunal, corporation, board, or person[1] or to control an arbitrary or capricious exercise of discretion.[2] This court has original jurisdiction to issue writs of mandamus under the Nevada Constitution Article 6, Section 4.[3] Generally, mandamus will not issue if petitioner has a plain, speedy, and adequate remedy in the ordinary course of law.[4] Further, mandamus is an extraordinary remedy, and it is within this court's discretion to determine if a petition will be considered.[5] When circumstances reveal urgency or strong necessity or an "important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction," we may consider a petition for extraordinary relief, even if alternative remedies may be available.[6]
Here, the petition presents legal issues that implicate the Nevada Constitution and the public policy of this state. Therefore, a writ petition is an appropriate vehicle by which to challenge the Board's decision not to review the lease agreement.[7]
In addition, we conclude that the Board is required to review the merits of the agreement under NRS 331.110 governing the lease of offices for state purposes outside of existing state office buildings. NRS 331.110 provides in relevant part that "no such lease *631 may extend beyond the term of 1 year unless it is reviewed and approved by a majority of the members of the state board of examiners." (Emphasis added.) Because the Board has decided, based on the Attorney General's opinion letter, not to review the merits of the agreement, mandamus is an appropriate remedy to compel performance of a duty required of the Board by Nevada law.[8]
The Board argues that review of the agreement is a purely discretionary activity; the Board has already reviewed the agreement twice; and therefore, mandamus is not appropriate. We conclude, however, that the Board's review was based on an incorrect analysis of the scope of Nevada's constitutional debt limitations, and thus, the Board manifestly abused its discretion. A writ of mandamus is therefore appropriate.

Debt creation under Article 9, Section 3 of the Nevada Constitution
The primary issue presented in this petition is whether the lease-purchase agreement constitutes "public debt" and therefore falls within the ambit of Article 9, Section 3.
Article 9, Section 3 of the Nevada Constitution states, in relevant part:
State indebtedness: Limitations and exceptions. The state may contract public debts; but such debts shall never, in the aggregate, exclusive of interest, exceed the sum of two percent of the assessed valuation of the state ... except for the purpose of defraying extraordinary expenses, as hereinafter mentioned.
A public debt for these purposes is created when an obligation binds future legislatures to successive appropriations. An agreement to expend monies from currently appropriated funds does not implicate Article 9, Section 3 of the Nevada Constitution. As the Oregon Supreme Court explained in Constitutionality of Chapter 280, Oregon Laws 1975,[9] constitutional debt limitations were enacted primarily as a response to heavy borrowing by many states prior to 1840. These states financed internal and banking improvements; and after the depression of 1837, many defaulted on their obligations. States entering the union after 1840 (including Nevada) invariably included debt limitations in their constitutions. Such control over debt creation precluded carelessly imposed tax liabilities.[10]
There are two principle decisions of this court that are relevant to the current dispute; each is discussed in turn below.
In State ex rel. Nevada Building Authority v. Hancock,[11] this court considered whether a statutory financing scheme that used legislative appropriations to pay rent on state buildings, where the rent was used to pay off bonds sold to finance the buildings' construction, constituted "public debt." Specifically, the legislature created the Nevada Building Authority ("the Authority") and directed it to build facilities for state use. The Authority then declared, by resolution, its intention to construct buildings and athletic facilities on the University of Nevada campuses. The Authority's resolution explained that bonds would be issued to pay for the construction, and that payment on these bonds would be made solely from the Authority's income, which would be derived from fees and rent for the use of the buildings and facilities. The state would pay these fees and rent since it would use the constructed facilities. Additionally, the resolution provided that the bonds would not "constitute an obligation of the State of Nevada."[12]
The Hancock court determined that this scheme created public debt in contravention of the Nevada Constitution. Additionally, *632 the Hancock court determined that the Authority was, in effect, a state agency and was therefore not an entity separate from the state.[13]
In concluding that the scheme violated the Nevada Constitution's debt limitation provision, the Hancock court rejected the recognized exceptions to the constitutional proscription.[14] Specifically, the court determined that
realism demands that the indebtedness [for rent and fees] is immediately created for the aggregate amount required by the period of the pledge. Were the State to pledge its taxing power as security for the bonds payable in the future, such a pledge would fall squarely within art. 9, § 3. Surely, a pledge to make future appropriations for rent out of tax revenues must be similarly treated. A present debt is created by such a legislative pledge. To view the matter otherwise would exalt form over substance and impair the integrity of our constitutional government.
... [S]uccessive biennial appropriations for rent until the bonds issued ... are fully retired must be considered in the same light as a legislative pledge to make future appropriations for the same purpose. It is inconceivable that the legislature would default in either instance since the good faith of Nevada would not allow it.[15]
We decline to extend the "realism" rationale of the Hancock decision, and it is expressly overruled by our holding today. Instead, we adopt the sound reasoning of a majority of our sister states which have concluded that lease-purchase agreements, such as the one at issue here, do not violate constitutional debt limitations.[16] Our decision today is entirely consistent with our more recent pronouncement in Business Computer Rentals v. State Treasurer.[17]
*633 In Business Computer Rentals, the State Treasurer leased a computer from a private corporation under the terms of a lease-purchase agreement.[18] The agreement required the State Treasurer to make periodic payments over the course of three years; and if all payments were made, the computer would become the property of the state. The agreement contained a nonappropriation clause providing that if the legislature failed to appropriate sufficient funds for the State Treasurer to continue making payments, the lease would terminate and Business Computer Rentals would repossess the computer.[19]
Although the State Treasurer wanted to make the lease payments, he refused to do so because the Attorney General advised him that the agreement was contrary to the constitutional debt limitations contained in Article 9, Section 3 of the Nevada Constitution.[20] Business Computer Rentals petitioned for a writ of mandamus directing the State Treasurer to perform his obligations under the agreement, which this court ultimately granted.[21]
This court concluded that future legislatures were not compelled by the agreement to appropriate money for the State Treasurer to make the lease payments because of the express nonappropriation clause in the agreement. The court ultimately concluded that because the agreement did not create a legal obligation that could bind future legislatures, but merely created a rent expense that was payable solely from currently-appropriated revenue, no public debt was created within the meaning of Article 9, Section 3 of the Nevada Constitution.[22]
In analyzing whether the agreement at hand constitutes public debt under the Business Computer Rentals framework, it is necessary for this court to determine whether the legislature is compelled to appropriate money in the future.
Here, the lease-purchase agreement contains an express nonappropriation clause and provides that in the event of nonappropriation, the lessor/seller can retake the office space. We thus conclude that the legislature is not obligated to continue appropriating funds to cover the payments. The legislature is not involved in the lease agreement; this is not a situation where the borrowing function and the paying function are in fact performed by the same body. Moreover, since the office space may be reclaimed if funds are not appropriated, no issue exists with respect to the state's debt under Business Computer Rentals. Additionally, under the agreement, the holders of the certificates of participation are unable to seek recourse against the state or its agencies in the event the legislature fails to appropriate necessary funds.
It appears that the Attorney General's opinion with respect to this dispute turns primarily on a narrow reading of Business Computer Rentals that limits the holding to fungible equipment such as a computer.[23] The distinction is an artificial one rejected by the majority of courts.[24] As a general rule, lease-purchase agreements such as the one presented here will be upheld where the lease (1) contains a nonappropriation clause; (2) limits recourse to the leased property; and (3) does not create a long-term obligation binding on future legislatures.[25]
Finally, as pointed out by EICON, the public interest is likely promoted if the agreement at issue does not constitute public debt. Governmental agencies often need flexibility in acquiring property, and lease-purchase *634 agreements and financing arrangements provide this flexibility.[26]

Lending of the state's credit under Article 8, Section 9 of the Nevada Constitution
EICON argues that the lease-purchase agreement does not result in a lending of the state's credit in violation of the Nevada Constitution Article 8, Section 9, and therefore, the decision by the Board not to review the agreement was an abuse of discretion.
The Board argues, in accord with the Attorney General's opinion, that the agreement creates a financing scheme in which the state is arguably placing its credit behind EICON's ability to obtain financing. In addition, respondent argues that if the court considers the substance of the transaction over its form, the agreement cannot withstand constitutional scrutiny.
We conclude that because the state is not legally liable for the debts owed by EICON, the agreement does not run afoul of the Nevada Constitution.
Article 8, Section 9 of the Nevada Constitution provides: "The state shall not donate or loan money, or its credit, subscribe to or be, interested in the Stock of any company, association or corporation, except corporations formed for education or charitable purposes." The state loans its credit in violation of this section only if the state acts as a surety or guarantor for the debts of a company, corporation or association.[27]
Under the terms of the agreement, the state is not liable for any debts owed by EICON. The state is liable under the terms of the lease only for lease payments for which the legislature has made appropriations. If the legislature, in subsequent years, fails to appropriate sufficient money for the lease payments, the state has no further liability to EICON. Additionally, limitation on the state's liability under the agreement remains in spite of the assignment of lease payments to the third-party trustee; the state would not be liable to the holder of such certificates of participation, who would stand in no better position than EICON.[28]
Moreover, constitutional debt limitations do not "arbitrarily telescope multiyear agreements into a single year," and "[t]he determinative inquiry for purposes of the Constitution is not the extent to which the agreement resembles an installment purchase contract, but whether the payments in future years are contingent."[29] Here, payments in future years are wholly contingent on future legislatures making the necessary appropriations. Thus, the agreement is constitutional.
Finally, an extension of credit under these circumstances still would not violate the Constitution's prohibitions because the expenditure would be for a valid public purpose providing office space for a state agency.[30]

CONCLUSION
We conclude that the agreement does not violate the debt provisions of the Constitution and that the Board should have reviewed the merits of the agreement. In addition, we decline to extend the reasoning of the Hancock decision and, instead, expand upon our more recent decision in Business Computer Rentals. We, therefore, grant EICON's request and order the writ be issued.
NOTES
[1] See NRS 34.160.
[2] See Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981).
[3] See Ashokan v. State, Dep't of Ins., 109 Nev. 662, 667, 856 P.2d 244, 247 (1993).
[4] See State v. Dist. Ct., 116 Nev. ___, 11 P.3d 1209 (2000).
[5] Smith v. District Court, 107 Nev. 674, 677, 818 P.2d 849, 851 (1991).
[6] Falcke v. Douglas County, 116 Nev. ___, ___, 3 P.3d 661, 662-63 (2000); Business Computer Rentals v. State Treas., 114 Nev. 63, 67, 953 P.2d 13, 15 (1998).
[7] See, e.g., Jeep Corp. v. District Court, 98 Nev. 440, 443, 652 P.2d 1183, 1185 (1982) (recognizing that although mandamus is not appropriate in the face of effective alternative remedies, extraordinary relief may be granted where the circumstances reveal urgency or a strong necessity); see also Marlette Lake Co. v. Sawyer, 79 Nev. 334, 383 P.2d 369 (1963) (granting writ of mandamus in proceeding that challenged legislative authorization of state's water rights purchase that would exceed the constitutional debt limitation).
[8] See Round Hill, 97 Nev. at 603-04, 637 P.2d at 536.
[9] 276 Or. 135, 554 P.2d 126, 128-29 (1976).
[10] See Bowmar, The Anachronism Called Debt Limitation, 52 Iowa L.Rev. 863, 873 (1967).
[11] 86 Nev. 310, 468 P.2d 333 (1970).
[12] Id. at 312, 468 P.2d at 335. We note that at the time Hancock was decided, the constitutional limitation on public debt was one percent of the state's assessed value. The available, unused debt amount was $1,369,277.00, and the project contemplated by the legislature was estimated to cost $5,600,000.00. This amount obviously would have exceeded the available debt limit. Hancock, 86 Nev. at 312, 468 P.2d at 335.
[13] Id. at 314, 468 P.2d at 336.
[14] These exceptions are the "special fund" exception, where revenues are derived from a nongovernmental source, the "earned installment doctrine," where executory contracts exist, and the "current revenue doctrine," where expenses are payable only out of current revenue. Hancock, 86 Nev. at 316, 468 P.2d at 337-38; see State of Nevada v. Parkinson, 5 Nev. 15 (1869) (concluding that expenses payable from current revenue are not public debt under the constitution).
[15] Hancock, 86 Nev. at 316-17, 468 P.2d at 337-38.
[16] See, e.g., People v. Nunez, 658 P.2d 879 (Colo. 1983) (concluding that a lease-purchase agreement between a bank and the department of institutions for property on which group homes were to be constructed did not violate the constitutional prohibition on debt creation because each new yearly term of the lease commenced only when sufficient funds were appropriated and nothing in the agreement limited the legislature's discretion); Wilson v. Kentucky Transp. Cabinet, 884 S.W.2d 641 (Ky.1994) (determining that legislatively authorized road revenue bonds did not constitute state debt because funds to pay bondholders arose from discretionary biennial appropriations; therefore, no legally enforceable obligation to pay off the bonds existed, and risk of loss was on bondholders, even if legislature would be influenced by practical or moral considerations in determining whether to appropriate funds); Ruge v. State, 201 Neb. 391, 267 N.W.2d 748 (1978) (holding that financing plan for construction of state building using revenue bonds, with state to lease property with option to purchase and therefore, in effect, pay off bonds did not violate constitution because it created no obligation for state to pay if funds not appropriated); Schulz v. State, 84 N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140 (1994) (ruling that State Thruway Authority and Metropolitan Transportation Authority were public benefit corporations that existed independently of state for purpose of contracting legally binding obligations; whether to recognize a moral obligation is within the state's discretion and cannot be judicially imposed; a proposal to fund in a subsequent year, which includes a disclaimer and is subject to legislature's appropriation, does not create a legally binding debt); Haugland v. City of Bismarck, 429 N.W.2d 449 (N.D.1988) (concluding that three-step sale-leaseback-purchase financing arrangement to fund capital improvements did not implicate constitution because it contained a nonappropriation clause and city was not obligated to appropriate funds for the annual lease payment). But see Constitutionality of Chapter 280, Or. Laws 1975, 276 Or. 135, 554 P.2d 126 (1976) (criticizing other states for allowing their legislatures to bypass constitutional debt limitations and holding unconstitutional an act to create state building authority to borrow money, where money for retiring debt came from state; rationale exempting revenue bonds from the constitutional restriction inapplicable when the revenue comes from state's general fund).
[17] 114 Nev. 63, 953 P.2d 13 (1998)
[18] Id. at 64-67, 953 P.2d at 15-17.
[19] Id.
[20] Id.
[21] Business Computer Rentals, 114 Nev. at 71, 953 P.2d at 17.
[22] Id.
[23] See 2000-39 Op. Att'y Gen. at 5-6 (Dec. 22, 2000).
[24] See, e.g., Carr-Gottstein Props. v. State, 899 P.2d 136, 140 (Alaska 1995); In re Application of the Okla. Capitol Improvement Auth., 958 P.2d 759, 770 (Okla.1998).
[25] See Carr-Gottstein Props., 899 P.2d at 144.
[26] See Business Computer Rentals, 114 Nev. at 70, 953 P.2d at 17.
[27] See State ex rel. Brennan v. Bowman, 89 Nev. 330, 333, 512 P.2d 1321, 1322-23 (1973).
[28] See, e.g., Carr-Gottstein Props., 899 P.2d at 144; St. Charles City-County Library Dist. v. St. Charles Library Bldg. Corp., 627 S.W.2d 64, 68-69 (Mo.Ct.App.1981).
[29] Rider v. City of San Diego, 18 Cal.4th 1035, 77 Cal.Rptr.2d 189, 959 P.2d 347, 354-55 (1998).
[30] See 95-06 Op. Att'y Gen. at 27 (1995); 86-14 Op. Att'y Gen. at 51-52 (1986); Berger v. Howlett, 25 Ill.2d 128, 182 N.E.2d 673, 676 (1962) ("Assuming that the act in some ways permits the State to lend its aid or credit to the Authority, the furnishing of adequate office facilities for State government is a public purpose and a proper expenditure of State funds.").